UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

    FLOUR CITY BAGELS, LLC,[1]      Case No. 16-20213
    Chapter 11 Case

                            Debtor.

### DECLARATION OF KEVIN COYNE IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PAPERS

Pursuant to 28 U.S.C. § 1746, Kevin Coyne declares as follows:

1.     I am the Manager of HOT, LLC ("HOT"), which is the sole member of Flour City Bagels, LLC (the "Debtor"), the debtor and debtor-in-possession in this chapter 11 case. The Debtor is a member governed limited liability company. As more fully described below, since August 4, 2015, I have become familiar with the Debtor's financial condition, books and records, and business affairs. I submit this Declaration in support of the Debtor's chapter 11 petition filed concurrently on this date (the "Petition Date") and its first-day motions (collectively, the "First-Day Papers").

2.     Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information, and belief, based upon my personal knowledge, my review of relevant documents maintained in the ordinary course of the Debtor's business, and information provided to me by the Debtor's management or professionals working with me or under my supervision. I am authorized to submit this Declaration on behalf of the Debtor, and, if I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

[1] The last four digits of the Debtor's federal tax identification number are 9515.

I. **NATURE OF THE DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASE**

3. The Debtor is a limited liability company organized under the laws of the State of New York. Its headquarters are located in Fairport, New York. The Debtor operates 32 bakeries that serve authentic "New York Style" bagels, coffee, drinks, soups, salads, sandwiches, fresh fruit, and a variety of other related items. Its bakeries are located in three tightly-cluster geographic regions—Rochester (13 bakeries), Albany (13 bakeries), and Syracuse (6 bakeries). The Debtor's first bakery opened in 1983 in Troy, New York (as a flagship Bruegger's bakery). Its first bakery in Rochester opened in 1990, followed in 1993 by its first bakery in Syracuse.

4. Also in 1993, the Debtor opened its commissary in Rochester, at which it produces bagels for sale at all of its 32 bakeries. The Debtor employs approximately 425 people.

5. The Debtor's annual net sales were more than $22,000,000 during each of 2014 and 2015. The Debtor has the capacity to produce approximately 40,000 bagels per day, with sufficient room to increase its production.

   A. **Equity and Debt Structure; Replacement of Former Management**

6. The Debtor's outstanding membership interests are owned by HOT, a non-debtor New York limited liability company. There is no public market for the Debtor's equity securities.

7. The Debtor owes two tranches of secured debt, each of which is secured by substantially all of the Debtor's assets. The Debtor owes its first-priority secured lender, United Capital Business Lending, Inc., n/k/a Bridge Funding Group, Inc. ("United Capital"), the principal sum of $5,256,147.00 (plus interest, fees and costs) as of the Petition Date. The Debtor owes its junior, second-priority secured lender, Canal Mezzanine Partners II, LP ("Canal"), a Delaware limited partnership, $4,502,229.18 (plus interest, fees and costs) as of February 29,

2

2016. I am the President of Canal's ultimate managing member. Pursuant to certain pre-petition agreements between them, the obligations the Debtor owes to Canal (and the liens Canal holds to secure those obligations) are junior and subordinate to the obligations the Debtor owes to United Capital (and the liens that United Capital holds to secure those obligations).

8. As of 2013, three individuals, collectively, owned 100% of the membership interests in HOT, the Debtor's parent: F. Kenneth Greene, Richard DeCarr, and Michael Borrelli (collectively, the "Pledgors"). At that time, the Pledgors also managed and controlled the Debtor.

9. To induce Canal to make its subordinated loan during 2013 in connection with United Capital's and Canal's refinancing of certain debt, the Pledgors pledged all of their membership interests in HOT to Canal, under a certain Membership Interest Pledge Agreement dated February 8, 2013 (the "Pledge Agreement"). The Pledge Agreement conferred various rights upon Canal in the event a default occurred regarding its loan.

10. In or about June, 2014, the Debtor defaulted on its obligations to Canal under Canal's loan agreements. On December 31, 2014, United issued a notice of default to Debtor, listing various events of default under its loan agreements. On March 11, 2015, Canal issued a notice of default to Debtor listing various events of default under the Canal loan documents. On April 21, 2015, United issued a notice to Debtor, accelerating the indebtedness and demanding payment in full of $5,255,780.53 within ten (10) days. On May 29, 2015, United Capital, the Debtor (and the other borrowers) entered into a forbearance agreement. By late July 2015, Debtor was in arrears in its obligations to various landlords, trade vendors and the New York State Department of Taxation for unpaid sales taxes.

11. On August 4, 2015, and with United Capital's prior written consent, Canal took action under its Pledge Agreement. Specifically, Canal exercised its contractual rights to assume sole voting control of HOT and, as a result, became the sole voting member of HOT. (Canal did not, however, assume ownership of the membership interests in HOT, which remained with Messrs. Greene, DeCarr and Borrelli.) Canal voted the membership interests in HOT to designate me as HOT's sole manager. As previously noted, HOT is the Debtor's sole member, and the Debtor is a member-governed limited liability company. HOT then took several actions with respect to its wholly-owned subsidiary, the Debtor. It immediately terminated the Debtor's employment of Messrs. Greene and Borrelli and, to the extent they were officers or had any other relationship with the Debtor, terminated them from any such roles as well. (Mr. DeCarr already had departed in 2014.)

12. Shortly after August 4, 2015, the Debtor engaged Phoenix Management Services, LLC ("PMS") to advise and assist the Debtor in conducting its financial affairs. Richard J. Szekelyi, a principal of PMS, was appointed as the Debtor's "chief restructuring advisor," and was granted certain limited powers to, among other things, enter into leases, lease extensions, and sign checks on the Debtor's behalf, in furtherance of PMS's and his duties in advising and assisting the Debtor.

13. Since August 4, 2015, the Debtor has examined Debtor's previous operations in an effort to address certain financial matters. For example, Debtor has investigated most of its major payments. Based on that review, Debtor is investigating whether, during the period they managed the Debtor's affairs, some or all of Messrs. Greene, DeCarr, and/or Borelli engaged in conduct that harmed the Debtor and its business, such as causing the Debtor to pay them

4

compensation in excess of permitted levels under the loan documents and diverting the Debtor's funds or assets to support other, unrelated ventures.

14. Since August 4, 2015, I have directed that actions be taken to improve Debtor's operations. For example, I have directed that the Debtor take the following actions: (a) paying its current obligations, including rent to landlords, (b) paying as much as possible on its pre-September arrearages to its landlords, (c) making capital and other improvements to its bakery stores, (d) restocking its bakery stores' shelves to the proper levels, and (e) bringing its "critical vendors" within agreed payment terms, thereby improving vendor relations and garnering more support. The Debtor also discontinued the excessive compensation payments and cancelled health insurance payments for individuals who no longer work for the Debtor. The Debtor also stopped paying rent to a landlord (of which Messrs. Greene and/or Borelli are believed to be part-owners) for a drive through window in connection with a bakery, since there was a separate lease with a separate landlord, which includes an easement for the drive through window.

15. Despite Debtor's actions to address past due rents and related expenses, certain landlords have initiated eviction proceedings that would cause the Debtor to lose one if its most profitable bakeries and its commissary. Those actions are captioned *Monroe Clover Plaza, LLC v. Flour City Bagel, LLC, et al.* and *University Business Center, LLC v. Flour City Bagel, Inc., et al.* Eviction hearings, originally set for February 22 and 23, are now set for March 7 and 8. The loss of the commissary would have a devastating impact on the operations and enterprise value of the Debtor. There have been discussions with the landlords, but there is no resolution at this time.

16. The Debtor is also in arrears on sales tax obligations in an amount of approximately $1 million. The unpaid sales taxes all relate to activity before August 4, 2015. All sales taxes since August 4, 2015, have been paid. Nevertheless, the New York State Sales Tax Department has issued levies and Notices of Garnishment in an attempt to collect this debt.

17. The Debtor is also a defendant in a tragic personal injury case arising out of an accident which occurred in May 2015. That action is captioned *Karina Nicolakis v. Ryder Truck Rental, Inc., et al.*, Case No. 24208/15 E. The plaintiff has filed a Motion seeking a prejudgment attachment, appointment of a receiver and related relief. An initial hearing on the motion was held on February 29, 2016, and the plaintiff has until March 11, 2016, to submit further materials in support of the requested relief.

### B. The Debtor's Relationship With Bruegger's

18. While the Debtor has made significant strides with its vendors, some of its landlords, and its customers to remedy the harm that the Debtor's prior management is believed to have caused, the Debtor's franchisor remains displeased. Restoring that relationship has proved to be considerably more challenging.

19. Since its earliest days, the Debtor has been a Bruegger's Bagels franchisee. The Debtor and Bruegger's Franchise Corporation ("BFC") entered into 31 franchise agreements on or about February 23, 2001, for the operation of 31 Bruegger's Bagels franchise bakeries. One of those bakeries, which was located at 29 N. Pearl Street in Albany, New York, and which had been operating under one of those 31 franchise agreements, closed in or about July 2015, leaving 30 franchise agreements remaining (collectively, the "30 Franchise Agreements").

20. The Debtor and BFC also entered into a franchise agreement on or about September 17, 2005, for the operation of one franchise bakery located at 24 State Street,

6

Pittsford, New York 14534 (the "Pittsford Library Franchise Agreement"). Likewise, the Debtor and BFC entered into a franchise agreement on or about December 28, 2009, for the operation of one franchise bakery located at 2951 Monroe Avenue, Rochester, New York 14618 (the "Monroe-Clover Franchise Agreement").

21. The Debtor and Bruegger's Enterprises, Inc. ("BEI") entered into the Amended and Restated Administrative Services Agreement on or about November 29, 2004 (the "ASA"), under which BEI agreed to provide certain administrative services to the Debtor. The Debtor and BEI also entered into the BagelNet Information Technology Agreement on or about December 28, 2009 (the "BagelNet Agreement"), under which BEI agreed to provide certain technology services to the Debtor. The BagelNet Agreement thereafter was assigned to LDA Management Company, Inc. ("LDA").

22. The 30 Franchise Agreements with BFC expired on December 1, 2014. Thereafter, BFC consented to the Debtor's continued operation under those 30 Franchise Agreements, on a month-to-month basis, until and including July 31, 2015.

23. Following further negotiation, BFC, BEI, and LDA (collectively, "Bruegger's") and the Debtor entered into two extension agreements – the first, dated as of August 21, 2015, and the second, dated as of September 30, 2015 -- under which the Debtor and Bruegger's agreed (among other things) to extend the term of the 30 Franchise Agreements until (and that the terms of the Pittsford Library Franchise Agreement, Monroe-Clover Franchise Agreement, the ASA, and the BagelNet Agreement each would expire on) October 31, 2015. Efforts among the Debtor and Bruegger's after October 31, 2015, to reach agreement for a third extension have been unsuccessful to date.

7

### C. The Debtor's Intentions for Its Chapter 11 Case

24. The Debtor anticipates pursuing a two-prong approach to its chapter 11 case. The first prong the Debtor will pursue is to begin marketing its business for sale as a going concern. The Debtor hopes to find a purchaser willing to pay a satisfactory, market-tested price and whom Bruegger's will accept as a new franchisee -- so that the Debtor's bakeries may remain a part of the "Bruegger's Bagels System", albeit under new ownership. For the period before August 2015, the Debtor owes Bruegger's franchise fees totaling approximately $401,000. The Debtor made franchise payments from August through approximately the second week of December, 2015, when the parties' discussions regarding a third extension of the franchise arrangements slowed to a crawl. For the period from mid-December 2015 through the Petition Date, the Debtor owes unpaid franchise fees to Bruegger's of approximately $325,000.

25. Whether the Debtor's bakeries will remain a part of the "Bruegger's Bagels System" will depend, in part, upon Bruegger's actions. The Debtor owns and operates its own commissary. It manufacturers all of the bagels it needs for its bakery stores. Consequently, preserving the Bruegger's franchise may not be necessary to an effective reorganization. Instead, the Debtor potentially may opt to "de-identify" (e.g., remove all Bruegger's signage, refrain from utilizing any Bruegger's "marks", etc.), and operate into the future as an independent company no longer associated with the "Bruegger's Bagels System."

26. On or about February 2013, BFC delivered a "Franchisor Consent and Estoppel Certificate" to United Capital and Canal, which Canal has interpreted to grant an 18-month period (of which Canal claims that approximately 12 months remains) within which Canal may seek to transfer the affected franchise locations to a new franchise operator, subject to certain rights of Bruegger's (including its right to approve the purchaser). Unless an interim

Case 2-16-20213-PRW    Doc 11    Filed 03/02/16    Entered 03/02/16 22:45:42    Desc Main
Document      Page 8 of 19

accommodation can be reached that satisfies all parties until a going concern sale of the Debtor's business can be consummated, this dispute may require a judicial determination.

27. In conjunction with its efforts to sell its businesses a going concern, on or about November 30, 2015, the Debtor engaged the services of Phoenix Capital Resources ("PCR"), as an investment banker to assist the Debtor in marketing its business and seeking prospective buyers. Since then, PCR has assembled information for and created a confidential information memorandum and related materials (the "CIM") for dissemination to those who may be interested in purchasing the Debtor's business operations. During January 2015, the Debtor shared a draft of the CIM with Bruegger's representatives for their comments, and has been awaiting feedback from Bruegger's regarding it. To date, Bruegger's has not responded regarding the CIM.

28. Despite Bruegger's silence, the Debtor is poised to initiate its marketing and sale efforts, with PCR's assistance, while simultaneously continuing the efforts that the Debtor's new management and its financial advisor, PMS, began last August to restore the Debtor's financial strength. Therefore, as explained more fully below, the Debtor is seeking the Court's permission to continue engaging PMS and PCR in their respective capacities, post-petition. In due course, the Debtor anticipates filing a motion with this Court seeking approval of various marketing and bidding procedures for any such sale.

29. The second prong the Debtor will pursue -- if its marketing efforts do not produce offers for the Debtor's assets that are within or greater than the range the Debtor anticipates – is to prepare and submit a stand-alone chapter 11 plan of reorganization. That plan would provide for a restructuring of its debts, distributions to holders of allowed claims, and other appropriate matters.

9
Case 2-16-20213-PRW    Doc 11    Filed 03/02/16    Entered 03/02/16 22:45:42    Desc Main Document    Page 9 of 19

30. Whether by virtue of a sale under section 363 of the Bankruptcy Code or a chapter 11 plan, the Debtor's objective in this case is and will be to preserve the value of its ongoing business, in order to maximize the recoveries for its various stakeholders.

## II. FIRST-DAY PAPERS

31. Concurrently with the filing of this chapter 11 case, the Debtor filed a number of First-Day Papers.[2] The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this case, at which the Court will hear the First-Day Papers. The First-Day Papers are generally designed to facilitate the establishment of certain administrative procedures to promote a smooth transition into chapter 11. The background in support of the salient First-Day Papers is provided below:

### A. Debtor's Motion for Entry of an Interim Order (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection, (III) and Setting a Final Hearing

32. In order to continue to operate its business during the restructuring process, the Debtor is seeking interim and final orders authorizing it to use cash collateral ("Cash Collateral"). The Debtor intends to use Cash Collateral for the continued post-petition operation of its business in exchange for providing its two pre-petition lenders, United Capital and Canal, with adequate protection to protect them in the event the value of their collateral diminishes. United Capital and Canal have expressed a willingness to consent to the use of their Cash Collateral, but only subject to the terms and provisions of a proposed interim order the Debtor has submitted with its request.

33. The Debtor does not have sufficient sources of working capital and financing to

---

[2] Capitalized terms not defined in the sections below have the meanings ascribed to them in the applicable First-Day Paper.

10

Case 2-16-20213-PRW    Doc 11    Filed 03/02/16    Entered 03/02/16 22:45:42    Desc Main Document      Page 10 of 19

operate its business without the use of the Cash Collateral. The continued viability of the Debtor's business depends upon its ability to maintain business relationships with its vendors, suppliers and customers, pay its employees, purchase inventory, and otherwise fund its business operations. Without immediate access to the use of Cash Collateral, the Debtor could not continue to operate its business, resulting in serious and irreparable harm to the Debtor and its estate. The Debtor must preserve and maintain, if not enhance, its going concern value in order to successfully reorganize under chapter 11 of the Bankruptcy Code. The use of the Cash Collateral therefore is and will be vital to the Debtor's ability to maintain its enterprise value for the benefit of all creditors and parties in interest.

34. I believe that the use of Cash Collateral is essential for the continued operation of the Debtor's business and that, if the relief requested in the Motion is not granted, the Debtor will not be able to continue to operate its business and restructure under chapter 11.

**B.  Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to (A) Pay Prepetition Compensation and Reimbursable Employee Benefits, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefit Programs**

35. The Debtor currently employs 215 full-time employees and 210 part-time employees (collectively, the "Employees"). The Employees can be divided into two groups: (i) 40 salaried employees and (ii) 385 hourly employees. There are no unions. All of the Employees are paid weekly, in arrears, each Tuesday. The continued and uninterrupted service of these Employees is essential to the Debtor's continuing operations. The vast majority of the Employees rely exclusively on the compensation and benefits they receive from the Debtor to provide for their daily living expenses, and these Employees would be exposed to significant financial difficulties if the Debtor is not permitted to continue paying and providing

compensation and benefits in the ordinary course of its business, including amounts the Employees earned before the Debtor commenced this chapter 11 case.

36.   It is estimated that approximately $145,000.00 in pre-petition wages, salaries, overtime pay and other cash compensation has accrued in the ordinary course of the Debtor's business prior to the Petition Date and remains unpaid (collectively, the "Unpaid Compensation"). The Unpaid Compensation is due to be paid on March 8, 2016 (the "Payroll Date"). The Debtor believes that it does not owe any Employee a prepetition amount in excess of $12,475.00.

37.   The Debtor offers its Employees other forms of compensation, including, without limitation, vacation leave, health insurance, dental insurance, life insurance, workers' compensation and disability insurance.

38.   The Debtor provides vacation time to its Employees, the amount and accrual rate of which is based generally on an Employee's length of service and level within the Debtor's organization ("Vacation Time"). Ordinarily, when an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate. The Debtor estimates that its Employees have accrued no greater than $50,000 of unused Vacation Time as of the Petition Date. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused Vacation Time when they use the Vacation Time in the ordinary course of business. The Debtor anticipates that its Employees will utilize any accrued Vacation Time in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtor's normal payroll obligations.

39.   Prior to the Petition Date, and in the ordinary course of its business, the Debtor reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the

12

Case 2-16-20213-PRW    Doc 11    Filed 03/02/16    Entered 03/02/16 22:45:42    Desc Main
Document     Page 12 of 19

Debtor in the scope of their employment (collectively, the "Business Expenses"). The Business Expenses may include, among other things, (a) business-related travel expenses; (b) business development expenses; (c) telephone expenses that are paid by Employees; and (d) other miscellaneous business expenses. Most Business Expenses are reimbursed directly to the Employees following the date the expenses are incurred either as supplemental payroll payments or by check.

40. As of the Petition Date, the Debtor's unpaid Business Expenses total approximately $10,000.00. In addition, it is possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtor after the Petition Date.

41. The Debtor provides certain Employees and their eligible dependents with group insurance coverage for medical care, dental care, short-term disability, and life insurance (collectively, the "Health Benefit Plans"). The Debtor's health coverage is provided by Excellus for their eligible Employees, and approximately 75 Employees receive such benefits. The Debtor pays Excellus approximately $30,000 per month in connection with the medical benefits plan. The Debtor and its Employees share the costs of the monthly premiums, and the Employees' portion is withheld from their paychecks. As of the Petition Date, health insurance premiums totaling approximately $30,000 are owed to Excellus by the Debtor.

42. The Debtor sponsors a dental, vision and life benefits plan for its eligible Employees. Approximately 70 Employees have elected to receive dental and vision benefits and 215 Employees receive life insurance benefits. The entire amount of their monthly premium is withheld from their paychecks. Guardian provides coverage under the Debtor's dental, vision, and life benefits plan. In connection with the dental, vision, and life benefits plan, the Debtor

13

pays approximately $2,600.00 per month. As of the Petition Date, the Debtor owes $2,600.00 with respect to the premium payments due to Guardian.

43. The Debtor sponsors short-term disability benefits for their eligible Employees through Prudential Insurance Company. The premiums are billed on a quarterly basis, and are based upon a monthly census. On average, the payments to Prudential Insurance Company for short-term disability coverage costs the Debtor approximately $1,770 per month. As of the Petition Date, the Debtor owes $1,770 with respect to the premium payments due Prudential Insurance Company.

44. The Debtor also offers its Employees the opportunity to participate in a defined contribution qualified retirement plan under section 401(k) of the Internal Revenue Code. As of the Petition Date, unpaid contributions totaling approximately $2,000.00 are due to be deposited by the Debtor into its Employees' retirement accounts.

45. The Debtor provides workers' compensation benefits ("Workers' Compensation Benefits") to all Employees. These benefits are covered primarily under the Debtor's workers' compensation insurance programs, which are insured and administered by Roachdale Insurance Company. On average, the Debtor pays a total annual premium of approximately $195,000, of which the next payment of approximately $15,000 is due on or about March 15, 2016 for the current policy. The current policy is effective for the period of July 1, 2015 through July 1, 2016.

46. During each applicable pay period, the Debtor routinely withholds certain amounts from Employees' paychecks that the Debtor is required to transmit to third parties. Examples of such withholding include child support payments, wage garnishments, and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein

(such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

47. The Debtor forwards the Deductions to the appropriate third-party recipients. On average, the Debtor deducts approximately $2,500.00 in non-tax items from its Employees' paychecks each pay period. Due to the commencement of this chapter 11 case, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

48. Further, the Debtor is required by law to withhold from an Employee's wages amounts related to federal and state income taxes, Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the "Withheld Amounts"). The Debtor must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). The Debtor is current with respect to all Payroll Taxes as of the Petition Date.

49. I believe that the Debtor's prospects to rehabilitate in chapter 11 will be compromised unless the Debtor is given permission to pay the Employees the amounts they are owed for their pre-petition work, maintain their other benefits uninterrupted, and pay the related pre-petition Withheld Amounts, Deductions, and Payroll Taxes in the ordinary course.

**C. Motion to for an Order Authorizing Debtor to (A) Maintain Existing Bank Accounts, (B) Continue Using Existing Checks, and (C) Granting a Limited Waiver of the Deposit Guidelines Set Forth in 11 U.S.C. § 345**

50. The Debtor seeks entry of an order authorizing it to maintain existing bank accounts at KeyBank (which is included on the Office of U.S. Trustee's list of approved depositories), to continue using its existing checks, and granting a limited waiver of the deposit guidelines set forth in section 345. Granting such relief will facilitate a smooth transition of the

Debtor into chapter 11 and minimize expense to the estate. Further grounds for this request are set forth in the separate motion papers.

**D.    Motion for Entry of an Order Authorizing the Debtor to Honor Certain Prepetition Obligations to and to Otherwise Continue Certain Prepetition Customer Practices and Programs in the Ordinary Course of Business**

51.    The Debtor seeks entry of an order authorizing it to honor certain prepetition obligations to customers and to otherwise continue certain prepetition customer practices and programs offered in the ordinary course of its operations, including without limitation, (a) a gift card program offered by the Debtor at its various store locations (the "Gift Card Program"), (b) an electronic coupon offered through GroupOn (the "GroupOn Program"), and (c) a customer loyalty program known as the "Bottomless Cup" program (the "Bottomless Cup Program" and collectively with the Gift Card Program and the GroupOn Program, the "Customer Programs").

52.    The Gift Card Program offers the opportunity to purchase cards in varying denominations at the Debtor's store locations. These cards are issued to customers for the amount paid, and customers can redeem the cards in whole or in part at franchise locations operated by the Debtor. As of the Petition Date, the Debtor estimates that the total outstanding balance on Gift Cards purchased by customers under the Gift Card Program is approximately $824,000.

53.    Under the GroupOn Program, customers may purchase a GroupOn coupon at a discounted price, and redeem their GroupOn coupons for a gift card at a higher – for example, a customer may pay $20 for a $40 GroupOn coupon. Upon redeeming the coupon at the store, the customer would receive a $40 gift card. The GroupOn coupon expires if the customer fails to redeem the coupon at the Debtor's store location within 3 months of issuance. As of January 13, 2016, there were 8,867 GroupOn coupons outstanding with a gross redemption value of

16

$194,530.00 (because all coupons have passed their redemption, this figure reflects the price paid for the coupon).

54. The Bottomless Cup Program is a customer loyalty program under which a customer may purchase a travel mug from the Debtor for the price of $185.00 and in return, such customer is entitled to receive unlimited refills of coffee at no cost for a period of one year from the purchase date of the travel mug. The precise number of travel mugs currently in the marketplace and subject to this customer loyalty program is unknown as of the Petition Date. However, the cost of the Bottomless Program is not a material expenditure to the Debtor, and therefore its continuance may be in the best interest of the Debtor's estate as it will encourage repeat business and customer satisfaction.

55. The viability of the Debtor's business and its ability to maximize value for the stakeholders in this case depend on the patronage and loyalty of its customers. The Customer Programs encourage repeat business and ensure customer satisfaction, thus retaining current customers and attracting new customers. I believe that maintaining the Customer Programs is critical to the continued operation of the Debtor's business, and failure to honor these Customer Programs would impair customer relations. Accordingly, the Debtor seeks the Court's authorization to continue the prepetition Customer Programs.

E. **Motion for Entry of Interim and Final Orders Authoring Debtor to Pay Prepetition Taxes and Regulatory Fees**

56. In the ordinary course of its business, the Debtor is required to collect and/or pay sales, use and excise Taxes, as well as other Taxes and Fees. The Debtor must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Debtor conducts business.

Case 2-16-20213-PRW    Doc 11    Filed 03/02/16    Entered 03/02/16 22:45:42    Desc Main
Document      Page 17 of 19

57. Since August 2015, the Debtor believes that it is generally current with respect to the payment of Taxes and Fees, except that certain Taxes and Fees have accrued during the prepetition period that have not yet come due for payment. Specifically, for the weeks before March 2, 2016, the Debtor incurred sales tax estimated at approximately $35,000.00 and prepetition pay tax withholdings and employer payroll taxes totaling approximately $40,000.00. In addition, the Debtor further requests that all applicable banks and financial institutions be authorized and directed to receive, process, honor and pay any and all checks or electronic transfers drawn on the Debtor's accounts to pay all prepetition Taxes and Fees owed to the Taxing Authorities for matters incurred in the weeks before the Petition Date.

58. The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of the Debtor's business, all prepetition Taxes and Fees owed to the Taxing Authorities, including all Taxes and Fees subsequently determined upon audit to be owed for the weeks before the Petition Date.

**[Signature Appears on Next Page]**

I declare under penalty of perjury that the foregoing is correct.

Dated: March 2, 2016

                                                _____
                                                KEVIN COYNE

1921829_1