UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:

      FLOUR CITY BAGELS, LLC,          Case No. 16-20213-PRW
                                    Chapter 11

              Debtor.
_____

**DECISION AND ORDER
GRANTING BRUEGGER'S MOTION FOR AN ORDER
DETERMINING THAT LENDERS DO NOT HAVE
PRE-PETITION LIENS ON LEASES;
DENYING BRUEGGER'S MOTION TO COMPEL ASSIGNMENT
OF LEASES AND PERSONAL PROPERTY;
DENYING DEBTOR'S MOTION TO APPROVE SALE
OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS
FREE AND CLEAR OF ALL LIENS;
AND DENYING AS MOOT DEBTOR'S MOTION TO ASSUME
AND ASSIGN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

PAUL R. WARREN, United States Bankruptcy Judge

The perfectly round symmetry of a bagel bears little resemblance to the sharp angles that divide the parties in this Chapter 11 case. The Debtor, Flour City Bagels, LLC ("Flour City"), is a 33-year-old company that operates 32 Bruegger's Bagel Bakeries—as a franchisee—across western and central New York, employing over 400 people. (Coyne Decl., Debtor Ex. 21 ¶¶ 3-4). Flour City is the largest Bruegger's Bagel franchisee in the United States. But something went wrong with Flour City's long-running business. After a series of payment defaults by Flour City on its obligations to its secured lenders, beginning in 2014 and continuing into 2015, on August 4, 2015, Flour City's junior secured lender—Canal Mezzanine Partners II, LP ("Canal")—exercised its contractual right to assume control of Flour City's sole managing

member, HOT, LLC ("HOT"). (*Id.* ¶ 11). Since that time, Canal has operated Flour City's business. Canal has attempted to resurrect Flour City—to protect its investment—by terminating its former officers, by hiring numerous professionals to examine its books and to improve its operations, by negotiating with and paying down arrearages to its landlords, vendors, secured and priority creditors, and the franchisor, and ultimately by filing for bankruptcy to stave-off hungry creditors. (*Id.* ¶¶ 12-23).

Flour City filed for protection under Chapter 11 on March 2, 2016, listing secured debt in excess of $11 million and unsecured debt of nearly $3 million. (ECF Nos. 1, 322). Assets were estimated to have a value of $2.9 million. (ECF No. 322). According to Flour City, "[t]he purpose of the Debtor's chapter 11 case was to market and sell substantially all of the Debtor's assets as a going concern to a qualified third-party purchaser under section 363 of the Bankruptcy Code." (ECF No. 404 ¶ 10).

Flour City now seeks Court approval to sell substantially all of its assets, free and clear of all liens or interests, to Canal—the sole managing member of Flour City and the prevailing bidder at an auction held on June 28, 2016, for $5 million (consisting of $1.3 million in cash and $3.7 million in the form of a credit bid) ("Sale Motion"). (ECF No. 404 ¶¶ 24-27). Bruegger's Franchise Corporation, Bruegger's Enterprises, Inc., LDA Management Company, Inc., and Le Duff America, Inc. (collectively, "Bruegger's")—the back-up bidder, by virtue of its all-cash bid of $4.75 million—vociferously objects to the Sale Motion (ECF No. 431). Bruegger's contends that its all-cash bid was the highest and best bid. (*Id.* at 16-17). Bruegger's further asserts that the auction was not conducted in good faith because of the conflict created by the incestuous relationship between Canal and Flour City—resulting in Canal acting as both the seller and the buyer at the auction. (*Id.* at 22-23). Bruegger's also made two separate motions, which must

2

necessarily be disposed of before deciding Flour City's Sale Motion. (ECF Nos. 403, 425). First, Bruegger's seeks a determination that neither Canal nor the senior secured lender, United Capital Business Lending, Inc. ("United"), have any pre-petition liens on Flour City's bakery and commissary leases ("Motion to Determine Status of Leases"). (ECF No. 403). Second, Bruegger's seeks an Order compelling Flour City to assign all of those leases and all personal property to Bruegger's under the terms of its Franchise Agreements with Flour City ("Motion to Compel Assignment"). (ECF No. 425).

Because Canal and United failed to perfect their security interest in Flour City's leases, Bruegger's Motion to Determine Status of Leases is **GRANTED**. However, because Bruegger's likewise failed to perfect *its* interest in the leases or personal property—and because Bruegger's has demonstrated no right to specific performance—Bruegger's Motion to Compel Assignment is **DENIED**.

Turning to Flour City's Sale Motion to sell substantially all of its assets under 11 U.S.C. § 363(b), the Court finds that—based on the evidence offered at trial on the Sale Motion and after extensive briefing by the parties—Flour City has failed to carry its burden to prove by a preponderance of evidence that it exercised sound business judgment in selecting the bid of Canal as the highest and best bid. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Flour City has also failed to demonstrate a basis to sell its assets free and clear of liens under either § 363(f)(2) or (3) of the Code. Flour City's Sale Motion is **DENIED**. As a result, Flour City's request that the Court approve the Asset Purchase Agreement ("APA") between Flour City and Canal is rendered **MOOT**. And Flour City's request to assume and assign certain executory contracts and unexpired leases to Canal is also rendered **MOOT**.

3

# I.

## JURISDICTION

The Court has jurisdiction of this matter under 28 U.S.C. §§ 157(a), 157(b)(1) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and (N). This decision constitutes the Court's findings of fact and conclusions of law under Rule 7052 FRBP.

# II.

## FINDINGS OF FACT

On July 21 and 22, 2016, the Court held a trial on Flour City's Sale Motion. At trial, Flour City called three witnesses in support of the Sale Motion: Michael Jacoby ("Jacoby"), Flour City's investment banker from Phoenix Capital Resources ("PCR"); Richard Szekelyi ("Szekelyi"), Flour City's chief restructuring officer from Phoenix Management Services, LLC ("PMS"); and Kevin Coyne ("Coyne"), the principal of Canal responsible for Flour City's operations. Bruegger's offered the testimony of one witness: Robert Parette ("Parette"), Bruegger's former Chief Financial Officer. Canal called one witness, Michael Koeppel ("Koeppel"), to offer an expert opinion on the value of Flour City's leases. The following are findings of fact—made under Rule 7052 FRBP—based on the testimony of the witnesses and exhibits received in evidence at trial.

### A.    Background—and so it begins…

Flour City operates 32 Bruegger's Bagel Bakeries, concentrated in Rochester, Albany, and Syracuse. (Coyne Decl., Debtor Ex. 21 ¶ 3). Its flagship bakery opened in Troy, New York in 1983. (*Id.*). Locations expanded to Rochester, beginning in 1990, and then to Syracuse and Albany, beginning in 1993. (*Id.*). Also in 1993, Flour City opened a commissary in Rochester,

which produces the bagel "pucks" cooked and sold at its 32 bakery locations.  (*Id.* ¶ 4; Sale Hr'g Tr. at 110).  Flour City now employs about 425 people.  (Coyne Decl., Debtor Ex. 21 ¶ 4).

Until 2014, Flour City was managed and controlled by three principals: F. Kenneth Greene ("Greene"), Richard DeCarr ("DeCarr"), and Michael Borrelli ("Borrelli").  (*Id.* ¶ 11). Greene, DeCarr, and Borrelli collectively owned all of the membership interests of HOT—the sole managing member and parent company of Flour City.  (*Id.* ¶¶ 6, 8; Sale Hr'g Tr. at 330-31). After DeCarr's departure from the company in 2014, Greene and Borrelli continued to manage and control Flour City until their forced termination by Canal in August 2015.  (Coyne Decl., Debtor Ex. 21 ¶ 11).  To date, Greene, DeCarr, and Borrelli remain owners of the membership interests of HOT.  (*Id.*; Sale Hr'g Tr. at 331:8-14).[1]

## B.  Franchise Agreements with Bruegger's

Since its founding, Flour City has operated its bakeries as a Bruegger's Bagel Bakery franchisee.  Flour City is now the largest Bruegger's franchisee in the United States—owning 32 of the approximately 100 franchised Bruegger's Bakery locations as of the date of the petition. (*See* Sale Hr'g Tr. at 180:13-14, 392:1-5; Debtor Ex. 2 at 7).[2]  Flour City and Bruegger's entered into Franchise Agreements in connection with each of the 32 store locations.  (*See* Bruegger's Exs. 7a-7jj).  Many—if not all—of those Franchise Agreements have now expired by their terms, despite the negotiation of several extensions.  (*See* Coyne Decl., Debtor Ex. 21 ¶¶ 19-23; Bruegger's Exs. 7a-7jj).

---

[1]    According to the testimony of Kevin Coyne at trial, Greene owns 80% of the shares of HOT, while DeCarr and Borrelli each own a 10% share.  (Sale Hr'g Tr. at 331:6-7).

[2]    As of the date of the petition, Flour City owned and operated 32 bakeries.  As of June 30, 2016, two bakery locations had closed and the leases for those locations were rejected, under 11 U.S.C. § 365(a).  (*See* ECF No. 402).

5

Specifically, in February 2001, Flour City entered into 31 Franchise Agreements with Bruegger's, which expired on December 1, 2014. (ECF No. 403 ¶ 2). Flour City operated the 31 bakeries on a month-to-month basis through July 31, 2015. (*Id.*). One of those bakery locations closed on July 15, 2015. (*Id.*). The remaining 30 Franchise Agreements expired on July 31, 2015, when Bruegger's withdrew its consent to continued month-to-month operation. (*Id.*). In 2005 and 2009, Flour City and Bruegger's entered into two more Franchise Agreements, covering the Pittsford Library and Monroe-Clover locations. (*Id.* ¶ 3). Those agreements had expiration dates of September 9, 2015 and December 28, 2019. (*Id.*). By two extension agreements, Bruegger's extended the term of all 32 Franchise Agreements to run through October 31, 2015. (*Id.* ¶¶ 5-7).

On October 30, 2015, and again on January 22, 2016, Bruegger's sent notice to Flour City that it was exercising its rights under the Franchise Agreements, following their expiration. (ECF No. 425 ¶¶ 13, 16 & Exs. F & H; Bruegger's Exs. 7kk, 7ll). Bruegger's demanded that Flour City assign to Bruegger's its interest in all leases and sub-leases, with respect to 24 of Flour City's bakery locations. (ECF No. 425 ¶¶ 13, 16 & Exs. F & H; Bruegger's Exs. 7kk, 7ll). Bruegger's also exercised its right under the Franchise Agreements to purchase Flour City's furniture, fixtures, and equipment at those 24 locations. (ECF No. 425 ¶ 14 & Exs. F & H). Despite those demands, Flour City continued to operate as Bruegger's Bagel Bakeries, during which time the parties engaged in negotiations. (*Id.* ¶¶ 14-17). Those negotiations went flat. Flour City did not assign the leases or sell the personal property to Bruegger's in keeping with the Franchise Agreements. (*Id.*).

As a general matter, the various Franchise Agreements memorialize Flour City's agreement to pay Bruegger's a royalty fee equal to 5% of gross sales, in exchange for use of the

6

Bruegger's brand name, systems, recipes, and training. (*See, e.g.*, Bruegger's Ex. 5). Naturally, each of the Franchise Agreements contain provisions concerning the rights of Bruegger's—as franchisor—upon default or termination by the franchisee, including the following:

**16. 2** Upon expiration or termination of this Agreement, at Franchisor's option:

> **16.2.1** Franchisee shall assign to Franchisor Franchisee's interest in the lease or sublease for the Premises and, also at Franchisor's option, Franchisee's interest in the lease or sublease for the property in which Franchisee manufactures bagel dough.

> **16.2.2** Franchisee shall sell to Franchisor such of the furnishings, equipment, signs, and fixtures of the Franchised Bakery and of the bagel dough production facility as Franchisor may designate . . . .

(Bruegger's Ex. 4 ¶ 16; *see also* Bruegger's Ex. 5 ¶ 17.1.8; Sale Hr'g Tr. at 186-88). Non-compete clauses also appear as a standard provision in each of the Franchise Agreements between Bruegger's and Flour City:

> **17.2** Franchisee covenants that . . . for two (2) years after the expiration or termination of this Agreement or the approved transfer of this Agreement to a new franchisee, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in any Bagel Store which is, or is intended to be, located within ten (10) miles of the Approved Location or within five (5) miles of any other Bakery.

(Bruegger's Ex. 4 ¶ 17.2; *see also* Bruegger's Ex. 5 ¶ 18.2; Sale Hr'g Tr. at 190-92). The non-compete provision applies to owners, directors, and officers of Flour City, as well as employees who received training from Bruegger's, managers, and bakers at the commissary. (*See* Bruegger's Ex. 4 ¶ 17.7; Bruegger's Ex. 5 ¶ 18.7; Sale Hr'g Tr. at 218-21).

## C. Loan Agreements with United and Canal

In February 2013—while Greene, Borrelli, and DeCarr were in control of Flour City— Flour City borrowed $9 million from two lenders, secured by the assets of Flour City. (Coyne

7

Decl., Debtor Ex. 21 ¶ 7). Under the terms of their Subordination Agreement, United was the senior secured lender and Canal the junior secured lender. (*See* Canal Ex. 6). The purpose of the loans was to allow Flour City to renovate and add drive-thru windows for certain of its locations. (Sale Hr'g Tr. at 336:15-25). Flour City, United, Canal, and Bruegger's—as franchisor—all actively participated in negotiations concerning the terms of the loans that were ultimately made by United and Canal. (Sale Hr'g Tr. at 333-35).

The United and Canal loans closed on February 8, 2013. (*See* ECF No. 436 ¶¶ 1, 5 & Exs. B, D). Under the terms of the Loan and Security Agreement with United, Flour City obtained a loan in the principal amount of $6.5 million ("United Loan Agreement"). (ECF No. 436 ¶ 1 & Ex. B). As security for the United loan, Flour City granted United a security interest in:

> *[A]ll of the Borrowers' personal property and fixtures, wherever located, and now owned or hereafter acquired, including*: accounts, chattel paper, inventory, equipment, instruments (including promissory notes, including but not limited to that certain promissory note from Great Northern Pizza Kitchen, LLC to 2 Hot, LLC), investment property, documents, deposit accounts, letter-of-credit rights, *general intangibles* (including payment intangibles), membership interests in other entities, including other Borrowers, FLOUR CITY BAGELS, LLC, K2BMG, LLC, HOT SLICE, LLC, trademarks, including the trademarks, including the trademark for Great Northern Pizza Kitchens Registration Number 2571265, service marks, licensing agreements, including a licensing agreement by and between 2 Hot, LLC and Great Northern Pizza Kitchen, Inc., website domain names, promissory notes and supporting obligations and, to the extent not listed above as original collateral, proceeds and products of the foregoing.

(ECF No. 436 ¶ 2 & Ex. B) (emphasis added).

Under the Subordinated Note and Warrant Purchase Agreement with Canal ("Canal Loan Agreement"), Flour City obtained a loan in the principal amount of $2.5 million. (ECF No. 436 ¶ 5 & Ex. D). Under the Canal Loan Agreement, Flour City granted Canal a security interest in:

8

[A]ll Commercial Tort Claims pursuant to Section 4.9, Deposit Accounts, Electronic Chattel Paper, Equipment, Fixtures, *General Intangibles*, Goods, Inventory, Letter-of-Credit Rights, Payment Intangibles, Receivables, Software, Stock Rights, Supporting Obligations and Other Collateral, wherever located, in which a Debtor now has or hereafter acquires any right or interest, and the proceeds, insurance proceeds and products thereof, together with all books and records, customer lists, credit files, software, computer files, programs, printouts and other computer materials and records related thereto.

(ECF No. 436 ¶ 5 & Ex. D) (emphasis added). Canal later advanced Flour City an additional $800,000 in December of 2013, so that Flour City could pay past-due sales taxes owed to New York State. (ECF No. 436 ¶ 5; Sale Hr'g Tr. at 337:7-24). Both United and Canal filed UCC-1 Financing Statements covering the collateral as defined in their Loan Agreements. (Canal Ex. 5; ECF No. 436 ¶ 3 & Ex. C).

As additional protection for taking a subordinated secured position to United, the Canal Loan Agreement also included a Membership Interest Pledge Agreement ("Pledge Agreement")—that provided Canal with additional remedies in the event of default by Flour City. (*See* Coyne Decl., Debtor Ex. 21 ¶ 9; Canal Ex. 2). Under the Pledge Agreement, Greene, DeCarr, and Borrelli pledged their membership interests in HOT to Canal. (*See* Coyne Decl., Debtor Ex. 21 ¶ 9; Canal Ex. 2).

Bruegger's consented to the loans made by United and Canal to Flour City, memorialized by a Franchisor Consent and Estoppel Certificate ("Estoppel Certificate"), by which Bruegger's gave certain assurances to the lenders concerning the status of their secured interests. (Canal Ex. 29 at 1). "[A]s a material inducement to [Canal and United] to proceed with lending the sums set forth in the Loan Documents to [Flour City]," Bruegger's consented to the "granting by Franchisee to Lenders of a security interest in all of its assets, including assets located at Franchise Locations, pursuant to the terms and conditions of the Loan Documents." (*Id.* at 1 &

9

¶ 4).  The Estoppel Certificate also preserved Bruegger's rights and remedies under the Franchise Agreements, "including . . . the right to terminate any or all of the Franchise Agreements in accordance with the terms of the Franchise Agreements and applicable law." (*Id.* ¶ 8).

## D.     Canal Takes Over Flour City's Operations

In late-2014, Flour City defaulted on its payment obligations to both United and Canal under the Loan Agreements.  (Coyne Decl., Debtor Ex. 21 ¶ 10).   United issued a notice of default to Flour City on December 31, 2014, followed by Canal's notice of default on March 11, 2015.  (*Id.*; Canal Exs. 12, 13, 14).   Throughout late-2014 and mid-2015, Canal, United, and Bruegger's remained in communication about what actions to take with respect to Flour City's accumulating arrears.  (Sale Hr'g Tr. at 344).   Canal and United were hopeful that Bruegger's might purchase Flour City—even hiring an accounting firm in the summer of 2015 to confirm Flour City's sales figures.  (Sale Hr'g Tr. at 344-46).   Notably, as recently as October of 2014, Bruegger's had offered to purchase Flour City for $20 million—subject to due diligence.  (*See* Debtor Ex. 19).  The offer expired, and Bruegger's did not renew it.  (Sale Hr'g Tr. at 344-46).  No deal was reached with Bruegger's.   Flour City, operating under the control of Greene and Borrelli, continued its nose-dive.

On August 4, 2015, Canal exercised its rights under the Pledge Agreement and assumed sole voting control of HOT, Flour City's sole managing member.  (Coyne Decl., Debtor Ex. 21 ¶ 11).   Canal then voted its membership interests in HOT to designate Coyne—president and founder of Canal—as manager of HOT.    (*Id.*; Sale Hr'g Tr. at 346:5-9).   Coyne quickly terminated the employment of Greene and Borrelli and assumed complete operational control of Flour City, as the principal of Flour City's sole managing member.  (Coyne Decl., Debtor Ex. 21 ¶ 11; Sale Hr'g Tr. at 349-51).  Coyne testified that, at the time that Canal took control of HOT,

10

he recognized the dual roles he would now assume, as a fiduciary to Canal and as a fiduciary to Flour City. (Sale Hr'g Tr. 347:15-19).

To assist with the management, examination, and restructuring of Flour City, Coyne hired PMS. (Coyne Decl., Debtor Ex. 21 ¶ 12; Sale Hr'g Tr. at 350-51). Szekelyi, a managing director of PMS, was retained to act as the chief restructuring adviser for Flour City and to handle its day-to-day operations. (Sale Hr'g Tr. at 102:23; Coyne Decl., Debtor Ex. 21 ¶ 12). Upon examination of Flour City's books and records, Szekelyi found that "the accounting was really deplorable," and that the "business had been really abused." (Sale Hr'g Tr. at 105:15, 106:11). Flour City's bank accounts had not been reconciled in over a year-and-a-half; it was behind in paying vendors and landlords; it owed over $900,000 to New York State for delinquent sales taxes; Bruegger's was owed over $400,000 in past-due franchise fees; and employees were disgruntled because of bounced pay checks and lapsed medical insurance. (Sale Hr'g Tr. at 105:15-23, 106:11-21, 352-54). In addition, it appeared to Szekelyi that excessive compensation had been taken by Flour City's ousted principals, and that company funds had been diverted by the ousted principals to projects unrelated to Flour City's business operations. (Sale Hr'g Tr. at 107:17-23, 352:17-21).

In the following months, Szekelyi and Coyne worked to stabilize the business by rebuilding relationships with vendors, landlords, and employees. (Sale Hr'g Tr. at 352-54). They attempted to catch up the arrears owed on leases and franchise fees owed to Bruegger's. (Sale Hr'g Tr. at 353-54). They paid ongoing sales tax obligations as they became due—while chipping away at the past-due sales tax debt. (Coyne Decl., Debtor Ex. 21 ¶ 16). On behalf of Flour City, Coyne negotiated extensions of the Bruegger's Franchise Agreements—which had

11

expired in December of 2014 (those extensions running through October of 2015)—and Coyne brought franchise fees current through December of 2015. (Sale Hr'g Tr. at 359).

Despite the progress made by Flour City after Canal assumed control, problems were continuing to mount. Flour City did not have the capital to sustain the level of payments necessary for landlords, vendors, and Bruegger's—prompting Coyne to elect to stop making franchise payments to Bruegger's in December 2015, instead directing payments to landlords and trade vendors. (Sale Hr'g Tr. at 359-60). Negotiations between Canal—on behalf of Flour City—and Bruegger's, concerning the possible extension of the Franchise Agreements beyond October of 2015 failed. (ECF No. 425 ¶¶ 15-16). Bruegger's exercised its post-expiration rights under the Franchise Agreements, demanding assignment of leases and sale of Flour City's personal property. (*Id.*). New York State Department of Taxation—which was now owed nearly $1 million, secured by a tax lien—issued levies and notices of garnishment against Flour City. (Coyne Decl., Debtor Ex. 21 ¶ 16). And despite Flour City's efforts to catch up rent payments, the landlord of one of Flour City's most profitable locations and its commissary started an eviction proceeding. (*Id.* ¶ 15; Sale Hr'g Tr. at 360-61). Meanwhile, Canal had not received payments on their secured obligations since June of 2014. (Sale Hr'g Tr. at 340:11-13).[3] The long-coming perfect storm had arrived.

## E.    Flour City Files Chapter 11 Petition

Flour City—acting through Canal—filed for Chapter 11 bankruptcy protection on March 2, 2016. (ECF No. 1; Sale Hr'g Tr. at 360-61; ECF No. 514 ¶ 5). The Petition and amended schedules listed secured debt totaling $11.2 million owed to: United ($5.25 million), Canal ($4.5

---

[3]     Flour City—acting through Canal—did, however, reimburse Canal for the costs of its legal expenses in the amount of $80,000. (Sale Hr'g Tr. at 145:22-23, 148:19-25).

12

million), Lakeland Bank ($11,869.20), MRM Wealth Management ("MRM") ($350,000), New York State Department of Taxation ($949,824.11), and U.S. Foods ($140,699.71). (ECF No. 322, Schedule D). Unsecured debts totaled $2.75 million. (ECF No. 143, Schedule E/F). The United States Trustee ("UST") appointed a Committee of Unsecured Creditors ("Committee") on March 21, 2016, and counsel was hired to represent the interests of unsecured creditors in the case. (ECF No. 516 ¶ 2).

The petition lists Flour City's assets as totaling only around $2.9 million, consisting largely of office furniture, restaurant and bakery equipment, tables, chairs, and fixtures. (ECF No. 322, Schedule A/B). Szekelyi testified that the asset value was derived from the books and records of Flour City—which, admittedly, pre-dated Canal's takeover and were sadly in disarray. (Sale Hr'g Tr. at 154:13-155:9). Szekelyi analyzed the $2.9 million book value, considering the number of Flour City's stores—at that time, 32 stores plus the commissary—and he concluded that "[i]t didn't seem like it was completely unreasonable. So lacking anything more definitive, . . . I've accepted that number as reasonable." (Sale Hr'g Tr. at 154:13-18).

Along with the petition, various first-day motions were filed on behalf of Flour City, including a motion to approve the use of cash collateral and a motion for adequate protection, which were eventually settled. (*See* ECF Nos. 6, 221). Bruegger's opposed the motion for adequate protection, to the extent that adequate protection payments to United and Canal might be secured by a post-petition lien on Flour City's leases. (ECF No. 87 ¶ 19; ECF No. 110). Bruegger's argued that neither United nor Canal had pre-petition liens on those leases and that Flour City was required to assign its interest in those leases to Bruegger's under the Franchise Agreements. (ECF Nos. 87, 110). By a stipulated Standstill Agreement, the parties agreed to

13

preserve their rights concerning that legal issue, while Flour City continued to operate as a Bruegger's Bagel Bakery on an interim basis. (ECF No. 177, Ex. 1; ECF Nos. 222, 479).

Very early in the case, Flour City made it known that it planned to market its business and hoped to sell substantially all of its assets as a going concern, free and clear of liens, under 11 U.S.C. § 363(b). Flour City dismissed the notion of filing a disclosure statement and plan of reorganization, because "the chances of a successful one was pretty low," based on Szekelyi's cash flow analysis. (Sale Hr'g Tr. at 124:3-9). Coyne and Szekelyi testified that under a plan of reorganization, Flour City would be required to pay a larger amount of its debt—including the New York State sales tax obligation of nearly $1 million. (Sale Hr'g Tr. at 124:11-14, 384:7-385:16). Additionally, Flour City would have to continue operating as a Bruegger's franchisee, due to the non-compete clause in the Franchise Agreements, adding another $1 million a year in expenses—"[a]nd there just wouldn't be sufficient cash flow to take care of all those obligations in any reasonable amount of time." (Sale Hr'g Tr. at 124:15-20; 384:7-385:16). Coyne testified that if Flour City continued operating as a Bruegger's franchisee, it would also be required to make certain costly improvements to the bakeries, such as installing MerryChef ovens. (Sale Hr'g Tr. at 384:19-385:2). Coyne added that many of the bakeries were "tired"—needing additional capital expenditures of about $25,000 for each store, for fresh paint, carpeting, and furniture—which would also have to be addressed in a Chapter 11 plan to show that it was feasible. (Sale Hr'g Tr. at 385:18-386:6).

### 1.   *The Sale and Bid Procedures*

Flour City's professionals decided fairly quickly to pursue a § 363(b) sale of substantially all of Flour City's assets, free and clear of liens. To that end, on April 29, 2016, less than two months after the case was filed, Flour City filed a motion seeking approval of bid procedures for

the sale. (ECF No. 233). The motion was approved by the Court by an Order entered May 20, 2016 and amended on June 8, 2016 ("Bid Procedures Orders"). (ECF Nos. 233, 337, 360). The Bid Procedures Orders established dates for bid submissions, the auction sale, and a sale hearing, as well as the bidding and auction procedures. (ECF Nos. 337, 360).

In order to participate in the bidding process, the Bid Procedures Orders required a bidder to be deemed a "Qualified Bidder" by Flour City, based on the bidder's compliance with certain financial disclosures and demonstrated ability to perform. (ECF No. 337, Ex. A at 2-5). The Bid Procedures Orders provided that, if they bid, United and Canal would automatically be deemed to have submitted Qualified Bids and were permitted to participate in the auction—and credit bid their positions—notwithstanding the requirements for other bidders. (*Id.* at 4-5). Additionally, the Bid Procedures Orders waived the good faith cash deposit requirement for United and Canal, were either to submit a bid and prevail at the auction. (*Id.* at 3). The bid deadline was set for June 22, 2016, but extended to June 24, 2016 at the request of Bruegger's—and according to Coyne and Jacoby—this was done to afford Bruegger's the opportunity to submit a Qualified Bid. (ECF Nos. 337, 360; Sale Hr'g Tr. at 26:16-27:6, 372:22-373:5). The auction sale was set to take place on June 28, 2016. (*See* ECF No. 360 ¶ 2.c).

### 2. *The Marketing Efforts and Bidding*

Efforts to market Flour City, for sale as a going concern, began as early as November of 2015, when Coyne engaged the services of PCR—a sister entity of PMS—to explore the possibility of selling Flour City. (Sale Hr'g Tr. at 9:14-20, 368-69). Jacoby, a Senior Management Director at PCR, oversaw the marketing efforts. (Sale Hr'g Tr. at 8-10, 23:15-23). Jacoby testified that PCR gathered information about Flour City throughout the winter of 2015 and attempted to identify potential purchasers. (Sale Hr'g Tr. at 12-13). The goal was to "cast

15

as wide a net as possible" to identify potential buyers and to "maximize the value of the assets in a sale to a third party." (Sale Hr'g Tr. at 13:9-10, 27:17-18). PCR reached out to the top 200 restaurant franchisees in the country, identified other potential buyers from their own database, and received names of potential candidates from both Bruegger's and Coyne. (Sale Hr'g Tr. at 12:20-13:5, 18:24-19:6). After Flour City filed bankruptcy, PCR continued those marketing efforts, by issuing a press release to some 1,400 different magazines, publications, and websites, advertising the opportunity to purchase Flour City. (Sale Hr'g Tr. at 13:6-9; Debtor Exs. 4 & 8). PCR also sent a "teaser" summary fact sheet to another 300 entities—both strategic and financial prospective purchasers—identified through industry research. (Sale Hr'g Tr. at 17:15-18:21; Debtor Exs. 3 & 7).

As PCR collected information about Flour City, it shared the information in a virtual data room, made accessible to prospective purchasers who executed a nondisclosure agreement. (Sale Hr'g Tr. at 12:13-17, 23:4-6). Interested parties also received a confidential information memorandum ("CIM") prepared by PCR—detailing Flour City, its background, its recent change of management, its relationship with Bruegger's, and opportunities for growth. (Sale Hr'g Tr. at 13:25-14:7). Approximately 50 potential purchasers accessed the virtual data room and received the CIM, after signing a nondisclosure agreement. (Sale Hr'g Tr. at 23:7-14).

After the Court approved the bidding procedures for a § 363(b) sale of Flour City, Jacoby acted as the primary contact for bidders. (Sale Hr'g Tr. at 27:20-23, 375:15-17). Four parties submitted bids by the June 24, 2016 deadline: Premier New York Bagel Company, LLC ("Premier") for $6.5 million in cash, plus a note of $1 million; Graywood MRM, LLC

16

("MRM")[4] for $2.1 million; SuSu, LLC ("SuSu") for $2.165 million; Le Duff America, Inc. ("Bruegger's")[5] for $4.5 million. (Debtor Exs. 9-12). Only the Bruegger's bid package specifically proposed to continue operating the business as a Bruegger's Bagel Bakery, although the Premier, MRM, and SuSu bids left open that possibility. (*See* Debtor Exs. 9-12; Sale Hr'g Tr. at 42-44). Jacoby testified that he was very disappointed with the bids, because PCR was hoping to attract bids in the $12 million range, based on his projections of Flour City's enterprise value. (Sale Hr'g Tr. at 86:25-87:5). In his opinion, "[t]here was less interest in the assets than we would have thought or hoped for" because of the "need to spend money on sprucing up the stores, the geographic regions were not particularly attractive to many of the folks . . . , and the financial terms of the Bruegger's franchise agreements were unattractive as well." (Sale Hr'g Tr. at 87:7-13).

None of the bids were Qualified Bids when submitted. (Sale Hr'g Tr. at 34:10-12). PCR worked with the bidders over the following days to improve the offers so that they could become Qualified Bids. (Sale Hr'g Tr. at 34:24-36:9). Jacoby testified that "[o]ur goal was to have as many of these folks deemed to be qualified bidders as possible, so that we could have as many people as possible at the auction." (Sale Hr'g Tr. at 35:11-13). Coyne echoed similar hopes of attracting a third-party buyer and was, by all accounts, helpful and not obstructive during the marketing process. (Sale Hr'g Tr. at 375:6-7, 46:19-47:5, 48:15-17). Premier withdrew its bid

---

[4]     MRM is a secured creditor of Flour City. (*See* ECF No. 322, Schedule D). MRM partnered with another investor to form Graywood MRM, LLC, so that it could bid at the auction. (ECF No. 429 ¶¶ 1-3).

[5]     Le Duff is an affiliate of Bruegger's. (*See* Debtor Ex. 9). For the sake of simplicity, the Court will refer to the Le Duff bid as the Bruegger's bid.

before the auction commenced. (Sale Hr'g Tr. at 36:12-19). The bids of the remaining three parties were deemed Qualified Bids.

### 3. *The Auction*

The auction took place on June 28, 2016 at the offices of Bond, Schoeneck, and King, PLLC in Rochester, New York. (ECF No. 404 ¶ 25). Representatives of Bruegger's, MRM, and SuSu were present, as was Flour City's counsel, counsel for the Committee, counsel for Canal, and Messrs. Jacoby, Szekelyi, and Coyne. (*Id.*). Notably, Coyne attended the auction and served the dual roles as both Flour City and Canal's representative, with decision-making authority for both Flour City (the seller) and Canal (the proposed buyer). Bruegger's $4.5 million cash bid— which was for 24 of the 30 bakery locations and excluded the commissary location—was deemed to be the prevailing bid at the commencement of the auction. (Sale Hr'g Tr. at 37:10-13).

Early in the auction, the representatives of MRM and SuSu left. Accounts differ as to the reason for their departure. Jacoby testified that those parties declined to participate in the auction because they were unwilling to outbid Bruegger's $4.5 million cash bid. (Sale Hr'g Tr. at 37:7-20). However, MRM argues that it departed after being sequestered for hours in a separate conference room, and not given a chance to meaningfully participate in the auction. (ECF No. 429 ¶¶ 4-5).

After the departure of MRM and SuSu, the auction proceeded. At the outset, Flour City's counsel disclosed that Le Duff was an affiliate of Bruegger's. (Bruegger's Ex. 6 at 11:12-14). Counsel also disclosed that Coyne was acting on behalf of both Flour City and Canal. (*Id.* at 5:1-5; Sale Hr'g Tr. at 64:24-65:3). Canal submitted a bid of $4.7 million—$1.3 million in cash and the remaining $3.4 million as a credit bid—for all 30 stores and the commissary location. (Sale

Hr'g Tr. at 38:22-24). Bruegger's then increased its all-cash bid to $4.75 million. (Sale Hr'g Tr. at 38:21-39:4). In response, Canal raised its bid to $5 million—again, $1.3 million in cash and the remaining $3.7 million as a credit bid. (Sale Hr'g Tr. at 39:5-8, 40:4-5). At that point, Bruegger's did not make another bid. (Sale Hr'g Tr. at 39:5-8, 40:4-5). Canal announced that, if the successful bidder, it did not intend to operate Flour City as a Bruegger's franchisee. (Bruegger's Ex. 6 at 17:21-24, 26:10-15).

Importantly, Canal was not credit bidding its own second-tier position at the auction sale. Under an agreement with United—which was briefly mentioned on the record at the auction and was, at the time of trial, still being drafted by them—Canal had the authority to credit bid United's first-tier position. (Sale Hr'g Tr. at 50:12-51:5, 406-09; Bruegger's Ex. 6 at 18:24-19:3). The credit-bidding "agreement" between United and Canal was not disclosed to other interested parties until immediately prior to commencement of the auction. During the trial, counsel for Canal indicated that the "agreement" had not been formalized at that point, even though it afforded Canal the opportunity to credit bid a position that it otherwise did not enjoy. (Sale Hr'g Tr. at 406-09). Coyne testified that this "agreement" was negotiated in principle well in advance of the auction and was structured to give Canal options to repay United's debt. (Sale Hr'g Tr. at 406-09). One option allowed Canal to purchase the United debt, at a sizeable discount, at closing. (Sale Hr'g Tr. at 408:15-18). Under the other option, Canal would make a smaller principal down payment at closing, and then pay off the United debt over a period of time—paying more of the United debt than under the first option—but with a discount-based incentive if the remaining balance due to United was repaid on an accelerated basis. (Sale Hr'g Tr. at 408:19-409:2).

At the close of the bidding, Flour City's professionals—consisting of Flour City's attorneys, Jacoby, and Szekelyi—met to evaluate the two bids, compare them, and recommend one of the bids as the "highest and best" bid. (Sale Hr'g Tr. at 39:10-14). Coyne was sequestered in a separate room with Canal's counsel at this time because—in Coyne's words—he "was very aware of the two roles [he played] and the criticism it could bring" were he to participate in determining the highest and best offer. (Sale Hr'g Tr. at 377:14-21). Even before their after-auction meeting, Flour City's professionals had already attempted to calculate the cash amount that would be necessary to cover "must pay" costs at closing—including § 503(b)(9) claims, PACA[6] claims, and other administrative expenses and closing costs. (Sale Hr'g Tr. at 40:8-18, 129:11-130:23). The professionals also estimated the cash on hand and credit card receivables that might be available to Flour City by late September, the targeted closing time frame. (Sale Hr'g Tr. at 40:8-17, 129:11-130:23). In the professionals' estimation, $1.3 million in cash would cover all such expenses. (Sale Hr'g Tr. at 40:8-17, 129:11-130:23; *see* Debtor Ex. 14). Believing that accepting Canal's bid would not render Flour City administratively insolvent, the professionals determined that Canal's $5 million bid was the highest. (Sale Hr'g Tr. at 39:14-17, 69-71, 126:3-6). Their analysis did not take into account the possible validity of Bruegger's argument—that Flour City's leases were not encumbered by a lien in favor of Canal or United or the possible impact of the non-compete agreements—in determining the highest and best offer. (Sale Hr'g Tr. at 70:18-19).

Flour City's professionals then invited Coyne into the room to make their recommendation, and also to suggest some changes to the Canal offer, to make it consistent with the Bruegger's offer. (Sale Hr'g Tr. at 39:17-19, 56:6-8, 126:6-24, 151-52). The professionals

---

[6]     Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a *et seq.*

recommended that Canal post a deposit of 10% of the cash bid—although Canal was not required to do so under the Bid Procedures Order—to show that "Canal's got something to lose." (Sale Hr'g Tr. at 379:5-18). As the representative of Canal, Coyne testified that he was "not happy about it" and resisted the suggestion. (Sale Hr'g Tr. at 378:5). However, Coyne ultimately believed the deposit to be in the best interest of Flour City and agreed to make the deposit of $130,000. (Sale Hr'g Tr. at 379:25-380:6). Additionally, Canal agreed to pay the first $50,000 of transfer and sales taxes incurred by Flour City in connection with the sale of its assets. (ECF No. 404, Ex. I ¶ 5.9; Sale Hr'g Tr. at 126:18-20). Coyne testified that there was no discussion about Bruegger's challenge to the secured creditors' liens on leases in selecting the highest and best offer because "I've always just discounted it . . . because I've never believed that it's possible" in light of the Estoppel Certificate. (Sale Hr'g Tr. at 445:6-20). Coyne accepted the professionals' recommendation that the Canal offer was the highest and best offer. (Sale Hr'g Tr. at 164:1-5, 380:16-19). As Coyne saw it, Canal's bid was highest and best because "$5 million is greater than $4.75 million." (Sale Hr'g Tr. at 453:22-23). Coyne—acting as Flour City—selected the Canal bid—which bid Coyne had made acting as Canal. (Sale Hr'g Tr. at 380:16-19). Bruegger's bid was designated the back-up bid. (Sale Hr'g Tr. at 380:20-381:5).

At trial, Coyne was questioned at length about his competing goals at the auction, as the representative of both Flour City and, at the same time, as the representative of Canal. (*See* Sale Hr'g Tr. at 355, 368, 373, 454-55). On behalf of Flour City, Coyne said he owed a fiduciary duty to employees, vendors, and creditors of the Estate to stabilize Flour City and maximize its value to all creditors. (Sale Hr'g Tr. at 347:15-19, 368:13-17, 373:15-19, 454:2-9). Coyne testified that as the principal of Canal, he had a fiduciary duty to his investors to recover the

21

principal loan made by Canal to Flour City. (Sale Hr'g Tr. at 355:12-18, 455:15-21). Yet, Coyne reiterated that his goal as Canal was "the exact same" as that of Flour City—to maximize the value for all creditors. (Sale Hr'g Tr. at 368:13-17, 373:15-19, 454:2-9). In Coyne's words, Canal was a reluctant bidder at the auction because Canal was "going into this solely for the purpose of recovering principal"; Coyne did not increase the cash component of the Canal bid because "I didn't want to do anything more than was absolutely necessary for the recovery of principal on the Canal side." (Sale Hr'g Tr. at 455:15-21).

Some time after the auction was completed, Canal and the Committee discussed an additional payment to the unsecured creditors. (Sale Hr'g Tr. at 382-83). As Coyne characterized it, Canal wanted to acknowledge and financially reward the unsecured creditors class—which largely consisted of vendors that Flour City routinely did business with—to "buy some good will" and "get back in their good graces for being a member of the Rochester, Albany, and Syracuse markets going forward." (Sale Hr'g Tr. at 382:20-393:7). Canal agreed to pay the Committee $300,000—separate and apart from the $5 million bid—and agreed to waive any deficiency claim by United or Canal in the bankruptcy. (Sale Hr'g Tr. at 383:8-20).[7]

---

[7]    Coyne's version of events differs from that of Committee counsel. According to the Committee, after the auction was concluded, "the Committee initiated discussions with Canal through its counsel to ascertain Canal's willingness to use its position as a secured claimant in *gifting* to the general unsecured class an amount sufficient to make a meaningful distribution to the general unsecured claimants." (ECF No. 435 ¶ 10) (emphasis added). The somewhat conflicting version of events recounted by Canal and the Committee agree in a couple of puzzling respects. First, Bruegger's was not approached about the side-deal. Second, neither Canal nor the Committee seemed particularly troubled by the possibility that their gift scheme might run afoul of the distribution hierarchy under the Code. And the side-deal could not have been part of Coyne's analysis in selecting Canal's bid, on behalf of Flour City, because the discussion took place well *after* Coyne declared Canal the winner.

22

#### 4.       *The Sale Motion, Objections to Sale, and Bruegger's Lease Motions*

On June 30, 2016, Flour City filed the Sale Motion, along with the APA between Flour City and Canal—signed by Coyne on behalf of both—seeking to approve the sale of Flour City to Canal for $5 million. (ECF No. 404).[8]   The APA included the principal terms agreed upon following the auction—namely the combined cash and credit payment of $5 million for 30 bakery locations and the commissary, a 10% cash deposit, and the payment of the first $50,000 of the transfer and sales tax.  (*See* ECF AP No. 404, Ex. 1).  The Sale Motion and APA provided that Flour City would no longer operate as a Bruegger's franchisee and that Canal would pay all costs associated with de-identification.  (ECF AP No. 404 at 11 & Ex. 1 ¶ 1.13).  Canal intends to continue operating Flour City's bakery locations as an independent bagel bakery.  Flour City's Sale Motion makes no mention of the fact that on April 20, 2016, Flour City—presumably acting through Coyne—registered a new trade name with the New York Secretary of State: "The Original New York Bagel Company."  (*See* ECF No. 404, Ex. 1, Schedule 1.1(h)).   That information is mentioned in the APA attached as an exhibit to the Sale Motion.  It is unclear whether the existence of that asset was described in the data room to prospective buyers.

Assets to be purchased under the APA include substantially all of Flour City's business as a going concern, free and clear of all liens, claims, interests and encumbrances.  (ECF AP No. 404, Ex 1).   Notably, excluded assets are cash on hand at closing, credit card payments in process, and Flour City's causes of action against the former officers, directors, and principals of

---

[8]       Flour City filed the Sale Motion one day later than the date provided in the Bid Procedures Order, with Court permission.

23

Flour City (among others). (*Id.* ¶ 1.3).[9] The APA requires that the Sale Order include releases of all actions of any nature against Canal, United, or any of their former or current officers, directors, employees, or representatives. (*Id.* ¶ 1.8.3). Additionally, the Sale Order must include a release of any Chapter 5 claims against Flour City's suppliers, vendors, and landlords under the assumed contracts. (*Id.* ¶ 1.8.4). Under the APA, Flour City must assign to Canal all executory contracts and unexpired leases related to 30 bakery locations and the commissary. (*Id.* ¶ 1.2). The $300,000 payment to unsecured creditors is not mentioned in the Sale Motion or the APA.

Several interested parties have raised strenuous "*Lionel* objections" to the material terms of the proposed sale to Canal, as well as the insider nature of the transaction—the loudest of which is Bruegger's. (*See* ECF Nos. 426, 517). Bruegger's also brought competing motions related to Flour City's bakery and commissary leases—the Motion to Determine Status of Leases and Motion to Compel Assignment (collectively, "Lease Motions"). (ECF Nos. 403, 425). Flour City, Canal, and United all submitted papers in opposition to Bruegger's Lease Motions. (ECF Nos. 436, 448, 445, 450, 514, 517, 518). At trial, perhaps in an attempt to diffuse the Bruegger's Lease Motions, Canal offered the testimony of Koeppel, as a valuation expert. Koeppel testified that, in his opinion, the value of Flour City's interest in its bakery leases was worth a negative ($998,000), because 22 of the 30 leases were for "above-market" rents. (Sale Hr'g Tr. at 293, 298:20-299:6).[10] Although Koeppel had extensive experience valuing

---

[9]  By way of example, Flour City has already brought a fraudulent transfer action against two of its former principals, Borelli and Greene, alleging that they caused Flour City to enter into an unnecessary Drive-Thru Lease Agreement for their own benefit. *See Flour City Bagels, LLC v. 683 PVR, LLC et al.*, AP Case No. 16-2012-PRW (Bankr. W.D.N.Y. 2016).

[10]  In the first version of his report, Koeppel arrived at a positive value of $998,000, but one day later amended his report to a value of negative ($998,000). He testified that his original positive value was meant to reflect a positive value to the landlords—not Flour City, the lessee.

24

businesses, he testified that he had never previously looked at the value of leaseholds in isolation—only in combination with other intangible assets or as a subset of intangible assets. (Sale Hr'g Tr. at 262-63).

Other substantive objections to the Sale Motion were filed by the UST, along with MRM, and U.S. Foods—both secured creditors. (ECF Nos. 429, 438, 443, 515, 516). After the close of proof at trial, counsel to Flour City advised the Court that New York State Department of Taxation had consented to the sale by email. (Sale Hr'g Tr. at 499:10-22). However, that email was submitted to the Court after trial, by which New York State actually stated that the Department of Taxation "does not oppose the asset sale, so long as the sale order provides that valid liens attach to the sale proceeds in the order of their priority." (ECF No. 467). While New York State, the holder of a $1 million tax lien, may have consented to the § 363(b) sale, it most certainly did not consent to that sale being free and clear of its tax lien under § 363(f). (*See id.*). After the close of proof at trial, the parties waived oral argument in favor of submitting post-trial briefs. (*See* ECF Nos. 514, 515, 516, 517, 518). The Court took the matter under submission on August 12, 2016, after the deadline for submission of post-trial briefs had passed.

## III.

## CONCLUSIONS OF LAW

### A.    Bruegger's Lease Motions

Bruegger's filed two motions, that the Court must resolve before addressing Flour City's Sale Motion. First, Bruegger's requests a determination that Canal and United do not have pre-

---

(Sale Hr'g Tr. at 298-99, 302-04). Neither version of Koeppel's report was admitted in evidence by the Court. The Court also ordered both versions of Koeppel's report stricken from the docket. (ECF No. 466).

petition liens on Flour City's leases. (ECF No. 403). Next, Bruegger's requests an Order directing Flour City to assign the leases and personal property to Bruegger's under the terms of the parties' Franchise Agreements. (ECF No. 425).

**1.** ***The Motion to Determine Status of Leases***

In its Motion to Determine Status of Leases, Bruegger's seeks an Order declaring that Canal and United do not have pre-petition liens on the leases to the bakeries, that the post-petition adequate protection liens do not apply to the leases, and that any liens United and Canal may have on unencumbered property do not apply to the leases.[11] (ECF No. 403). The first issue presented by Bruegger's Motion to Determine Status of Leases is whether Canal and United properly perfected a security interest in Flour City's leases. The second issue is whether the Estoppel Certificate, given by Bruegger's to United and Canal, prevents Bruegger's from raising the first issue at all.

Bruegger's asserts that, in order to acquire a security interest in the leases, United and Canal would have had to comply with the requirements of New York Real Property Law §§ 290-91, not Article 9 of the Uniform Commercial Code ("U.C.C."). (ECF No. 403 ¶¶ 24, 30-33). Alternatively, Bruegger's argues that, even if the transaction is governed by the U.C.C., United and Canal failed to adequately describe the collateral covered by their security agreements sufficiently to include the Flour City leases. (*Id.* ¶ 25). In opposition, United and Canal claim that they have perfected security interests in all of Flour City's assets—including its leases— under the terms of the security agreements. (ECF No. 436 at 7-8). According to United and

---

[11] No party has objected to the procedural posture of either of the Bruegger's motions. Under Rule 7001(2) and (9) FRBP, these matters are brought by adversary proceeding. Because the parties have not raised an objection under Rule 7001, the Court will view such technical objections as having been waived.

26

Canal, the leases are intangible assets covered under their security agreements and are properly perfected by the filing of UCC-1 financing statements under Article 9 of the U.C.C.  (*Id.*). Further, United and Canal argue that Bruegger's cannot contest their security interests because of the Estoppel Certificate.  (*Id.* at 5-6).  Bruegger's counters, arguing that while the Estoppel Certificate acknowledges that United and Canal were taking security interests in Flour City's assets, it did not excuse United and Canal from the need to properly perfect those security interests.  (ECF No. 517 ¶ 42).

United and Canal seek to avoid the recording requirements of New York Real Property Law by arguing that they are not asserting a right to take *possession* of the leased properties. (ECF No. 436 at 8).  Instead, they claim a security interest in the economic value of the leases, which they argue is a "general intangible" in which they have a perfected security interest under the U.C.C.  (*Id.*).  In support of their argument, United and Canal point to the specific terms of their Loan Agreements with Flour City, as well as the Estoppel Certificate given to them by Bruegger's.  Under the United Loan Agreement, Flour City granted United a security interest in "personal property and fixtures" including "general intangibles."  (ECF No. 436 ¶ 2 & Ex. B). Under the terms of the Canal Loan Agreement, Flour City granted Canal a subordinate security interest in "collateral."  (*Id.* ¶¶ 5-6 & Ex. D).  "Collateral" is defined in the Canal Loan Agreement as "equipment, fixtures, general intangibles, goods, inventory, letter-of-credit rights, payment intangibles, receivables . . . and other collateral."  (*Id.*).  "General Intangibles" under the loan agreement has the same definition as "general intangibles" under Article 9 of the U.C.C.— "any personal property," including "Payment Intangibles."  (*Id.*, Ex. D).  The Estoppel Certificate provides, "Franchisor hereby consents to and approves of the granting by Franchisee

to Lenders of a security interest in all of its assets, including assets located at Franchise Locations, pursuant to the terms and conditions of the Loan Documents." (*Id.*, Ex. A).

So, did United or Canal properly perfect their security interest in Flour City's pre-petition leases under New York law? Is Bruegger's to be tongue-tied because of the Estoppel Certificate? The answer to both questions is no.

A word or two about the "relationship problems" that this issue highlights are in order, before moving on to the jurisprudence on the legal issue. The main opponents with respect to this issue are Bruegger's and Canal. (*See* ECF No. 403, 436). United takes a "me-too" posture, of course siding with Canal. (*See* ECF No. 436). Flour City chips in and "adopts the arguments of Canal and United." (ECF No. 448 ¶ 1). The Committee—perhaps in exchange for the $300,000 "gift" from Canal—has said nothing on the issue. Flour City is operated by Canal— and Canal is, for all intents and purposes, the voice speaking on Flour City's behalf in this case. Canal says that Flour City's interest in its leases are either subject to Canal's lien or have no economic value to the Estate. (ECF No. 514 at 26). Flour City—speaking through and controlled by Canal—says the leases are subject to Canal's lien and, if not, the leases can be sold as unencumbered assets by Flour City to Canal as part of the § 363(b) sale. (ECF No. 518 at 27-28). Tellingly, no one has mentioned the $1 million tax lien filed by New York State—and whether that lien attached to Flour City's economic interest in leases, if Canal, United, or Bruegger's did not properly perfect a lien on the leases. Coyne recognized the difficult position Canal undertook in attempting to exercise a fiduciary duty to Flour City and to Canal's investors. (*See* Sale Hr'g Tr. 347:15-19). But, to quote Coyne, "I don't have separate brains." (Sale Hr'g Tr. at 471:21-22). The inability of Flour City to speak—and make decisions—for itself in this

28

Chapter 11 cases gives the Court considerable pause concerning the deference to afford Flour City's decision-making, under the *Lionel* standard.

Turning to the jurisprudence on the issue, an assignment of leases is typically used to assign a *landlord's* rights under a lease to a creditor for the collection of rent as additional security for a debt. *See In re S. Side House, LLC*, 474 B.R. 391, 402-03 (Bankr. E.D.N.Y. 2012). The assignment grants to the creditor a security interest in the rent stream from the lease affecting the property. However, the situation here is very different from the cases where there is a challenge to a security interest in a lease for real property. Flour City's interest in the leases, as a tenant, is not an interest in a stream of rent revenue. Under the leases for its bakery locations and commissary, Flour City is obligated to pay rent to the landlords who own the real estate. The actual dollar "economic value" of the leases to Flour City is not before the Court to decide. According to Canal's valuation expert, Mr. Koeppel, the vast majority of Flour City's leases are for "above-market" rents. (Sale Hr'g Tr. at 293:4-7). In Koeppel's opinion, because the leases require Flour City to pay above-market rents, they have no "value" and, instead, are a liability to Flour City in the amount of ($998,000). (Sale Hr'g Tr. at 298:20-299:6, ECF No. 514 ¶ 30). Do United or Canal have a lien on the economic value—perhaps a hypothetical value at this point—of Flour City's leases?

It is a well-settled principle of bankruptcy law that property interests are created by and governed by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). "Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* The

29

Court looks to New York law to resolve this dispute.[12]  United and Canal allege that their security interest in Flour City's leases is a "general intangible" under New York U.C.C. § 9-102(42).  (ECF No. 436 at 8).  That provision defines the term "general intangible" as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes payment intangibles and software."  N.Y. U.C.C. § 9-102(42).  United and Canal brush off U.C.C. § 9-109(d)(11)—which excludes from U.C.C. Article 9 "the creation or transfer of *an interest in* or lien on real property, *including a lease* or rents thereunder"—by arguing that they do not claim an interest in the leases; they have an interest in the "economic value" of the leases. (ECF No. 436 at 2).  And, *abracadabra*, with a wave of their legal wand, United and Canal would make U.C.C. § 9-109(d)(11) disappear.

The appropriate starting place for determining the meaning of a statute is with the language of the statute itself.  *See Kearney Hotel Partners v. Richardson*, 92 B.R. 95, 98 (Bankr.

---

[12]    Both Loan Agreements contain choice-of-law provisions.  The United Loan Agreement states, "This Agreement and any other Loan Documents executed and delivered by any Borrower shall be governed by, and construed in accordance with, the laws of the State of Maryland, without regard to principles of conflicts of laws, *except to the extent that the validity or perfection of the security interest granted by or remedies provided under this Agreement are governed by the law of a jurisdiction other than the State of Maryland*."  (ECF No. 436, Ex. B ¶ 6.6) (emphasis added).  While the Canal Loan Agreement states that it is governed by Ohio law, it also authorizes the secured party "to file in any filing office in the State of Ohio *or any Uniform Commercial Code jurisdiction* any initial financing statements and amendments."  (ECF No. 436, Ex. D, Sects. 8.14, 8.4) (emphasis added).  Here, the parties do not appear to dispute the application of New York law.  The leases at issue are for real property located in New York. The UCC-1 financing statements were filed with the New York Secretary of State.  Therefore, the Court applies New York law.  The Court notes, however, that the U.C.C. provisions relevant to this decision are the same in New York, Maryland, and Ohio.

30

S.D.N.Y. 1988) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, (1976)).  The plain language of § 9-109(d)(11) excludes the creation of an "*interest* in real estate"—including "a lease or rents thereunder."  *See id*. at 98 (emphasis added).  Case law determining the applicability of the U.C.C. to other interests in property supports this plain language approach.  *See, e.g.*, *First Fid. Bank, N.A. v. Jason Realty, L.P.*, 59 F.3d 423, 427 (3d Cir. 1995) (stating that assignments of rent are interests in real property under the real property law of the state where the property is located); *see also In re Ocean Place Dev., LLC*, 447 B.R. 726, 731-32 (Bankr. D.N.J. 2011) (holding that interests in hotel room revenues are not "rents"—they are personal property licenses that fall under Article 9); *In re DBSI, Inc.,* 432 B.R. 126, 132 (Bankr. D. Del. 2010); *Alexander v. Breeden (In re Bennett Funding Grp., Inc.)*, 234 B.R. 600, 605 (Bankr. N.D.N.Y. 1999) (applying Article 9 to leases for the rental of office equipment); *Weitzner v. Goldman (In re Kavolchyck)*, 154 B.R. 793, 796-97 (Bankr. S.D. Fla. 1993), *aff'd sub nom*, *Barnett Bank N.A. v. Weitzner*, 164 B.R. 1018 (S.D. Fla. 1994) (stating that the plain language of the U.C.C. is "direct and self-explanatory" and does not cover the perfection of security interests in real property leases; thus, the proper method of perfecting such an interest was by recordation); *Kearney Hotel Partners*, 92 B.R. at 98-99 (distinguishing between an interest in income that arises from an *interest* in real property from an interest in income that arises from the *use* of real property).

The position of United and Canal—that their liens are not on the leases themselves, but on Flour City's economic interest or value in the leases—strikes the Court as a distinction without a difference.  United and Canal do not cite to any case law that was decided after the adoption of the U.C.C. in New York to support their position.  Even if United and Canal's word-parsing argument had legs—which it does not—their security agreements did not adequately

31

describe their collateral as including an interest in Flour City's leases under U.C.C. § 9-108(c). The UCC-1 financing statements used the terms "general intangibles" and "all assets" to describe the collateral. No party searching the U.C.C. filings with the New York Secretary of State would have been on notice that United and Canal asserted a lien on the "economic value" of Flour City's leases.

Under New York law, United and Canal were required to file a leasehold mortgage with the Clerk of the County where each of the bakeries was located, in order to perfect a lien on Flour City's "conveyance" of an interest in the leases. N.Y. Real Prop. Law § 291 (Consol. 2015). "The term 'conveyance' includes every written instrument by which any estate *or interest* in real property is created, transferred, mortgaged, or assigned . . . ." *Id.* § 290 (emphasis added). "[T]he lessee's interest in an appreciated leasehold is a possessory, real estate interest. One wishing to take a security interest in it should use a mortgage and comply with the real estate recording laws." 4 White & Summers, *Uniform Commercial Code* § 30:24 (6th ed. 2009); *see also DBSI*, 432 B.R. at 132. The Court holds that United and Canal failed to properly perfect their security interest in Flour City's leasehold interests in the manner required by New York Real Property Law § 291.

Having ruled that United and Canal do not have pre-petition liens on Flour City's leases under their Loan Agreements, Canal's argument that Bruegger's is precluded from raising the perfection issue because of the Estoppel Certificate falls flat. The Estoppel Certificate specifically provides that Bruegger's consents to the "granting by Franchisee to Lenders of a security interest in all of its assets . . . *pursuant to the terms and conditions of the Loan Documents.*" (Canal Ex. 29 ¶ 4). The terms of the United and Canal Loan Agreements do not grant the lenders a security interest in leases. The Estoppel Certificate cannot be used to prevent

Bruegger's from challenging what the terms and conditions of those Loan Documents were—or from mentioning that United and Canal are attempting to enforce a security interest that does not exist.

Because United and Canal failed to properly perfect their security interest in Flour City's leasehold interests in the manner required by New York Real Property Law § 291—and the Estoppel Certificate does not prevent Bruegger's from challenging the fact that United and Canal never properly perfected their liens on those leasehold interests—Bruegger's motion for a determination that United and Canal do not have pre-petition liens on Flour City's leases is **GRANTED**.

### 2. *The Motion to Compel Assignment of Leases and Personal Property*

By separate motion, Bruegger's also requests that the Court grant the remedy of specific performance to order Flour City to assign certain of its leases and sell certain of its personal property to Bruegger's, under the terms of its Franchise Agreements. (ECF No. 425). The Franchise Agreements provide that upon expiration of the agreements, Flour City is required to assign its interests in leases and sell its personal property to Bruegger's. (ECF No. 425, Ex. A ¶¶ 16.2.1, 16.2.2). Bruegger's candidly admits that it "does not have a security interest in the leases and has never asserted otherwise." (ECF No. 517 ¶ 45). Without a validly perfected security interest, Bruegger's is left in the position of a general unsecured creditor. To improve its position in bankruptcy, Bruegger's seeks to compel specific performance of its contract rights. (*See id.*).

Flour City counters and argues that Bruegger's is not entitled to specific performance because Bruegger's does not hold any perfected interest in the leases or Flour City's personal property. (ECF No. 450 at 1-2). Flour City goes on to assert that it can use its "strong arm"

33

power under 11 U.S.C. § 544(a) to avoid Bruegger's unperfected interest in both the leases and personal property. (*Id.*). Flour City argues that Bruegger's cannot compel specific performance under a contract rejected under 11 U.S.C. § 365, because Bruegger's claim can be reduced to one for money damages under 11 U.S.C. § 502. (*Id.*).

Under New York law, specific performance is available where the requesting party shows: "(1) the making of the contract and its terms, including a description of the subject matter; (2) that the party is ready, willing, and able to perform the contract and has fulfilled all of his duties to date; (3) that it is within the opposing party's power to perform; and (4) that there is no adequate remedy at law (an element that need not be pled where the contract is for the sale of real property)." *Petrello v. White*, 412 F. Supp. 2d 215, 230-31 (E.D.N.Y. 2006); *La Mirada Prods. Co., Inc. v. Wassall, PLC*, 823 F. Supp. 138, 140-41 (S.D.N.Y. 1993) (holding that where the assessment of monetary damages is impracticable, specific performance may be ordered).

Here, Bruegger's has not demonstrated the existence of the elements required to be awarded specific performance. Bruegger's offers no evidence to support its legal conclusion that it has no adequate remedy at law—unconvincingly asserting that "it is not required to show that there is no adequate remedy at law because the specific performance *relates to real property.*" (ECF No. 425 ¶ 24) (emphasis added). In the Court's view, Bruegger's misapplies the case law on this point. In *Petrello*, the court stated that the absence of an adequate remedy at law did not need to be pled where the contract for which the moving party was seeking specific performance was for the *sale of real property*—not merely related to real property, as Bruegger's would have it. *See Petrello*, 412 F. Supp. at 230. The Franchise Agreements at issue are not contracts for the sale of real property. Bruegger's must demonstrate the absence of an adequate remedy at law. It failed to do so.

34

Bruegger's also asserts that it will suffer "irreparable injury" if specific performance of the contract is not ordered. (ECF No. 425 ¶¶ 24-25). For support, Bruegger's relies heavily on *Dunkin' Donuts, Inc. v Dowco, Inc.*, Civil Case No. 5:98-CV-166, 1998 U.S. Dist. LEXIS 4526 (N.D.N.Y. Mar. 31, 1998). In *Dowco*, after termination of a franchise agreement with Dunkin' Donuts, the former franchisee sold its assets to a related entity and then continued to operate a coffee shop under a new name at that location. *Dowco*, 1998 U.S. Dist. LEXIS 4526, at *3-4. At the outset of their relationship, however, the franchisee had executed and delivered to Dunkin' Donuts a written assignment of lease for the coffee shop location—giving the franchisor possessory rights to the leasehold. *Id.* at *2. Dunkin' Donuts sought specific performance of the assignment of lease and a preliminary injunction, to prevent the former franchisee from operating a competing coffee shop at the leased location. *Id.* at *3-4. In granting the preliminary injunction, the court stated that irreparable injury is the most important element the movant must prove. *Id.* at *6 (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)). Further, "[t]he moving party must show that the irreparable harm is imminent rather than remote or speculative, and it must demonstrate that the injury is 'one incapable of being fully remedied by monetary damages.'" *Id*. The court was satisfied with the significant evidence introduced by Dunkin' Donuts to support a showing of irreparable harm—including evidence regarding the strength of its trademark, loss of a market location that was uniquely created for Dunkin' Donuts, and substantial similarity between Dunkin' Donuts' products and those of the coffee shop its former franchisee was operating at the location in dispute. *Id.* at *9-10.

In conclusory fashion, Bruegger's alleges that, like Dunkin' Donuts, it will suffer irreparable harm if Canal operates Flour City's bakery locations as bagel shops under a different

name—citing the likelihood of customer confusion and the loss of good will. (ECF No. 425 ¶ 25). However, unlike Dunkin' Donuts in *Dowco*, Bruegger's does not hold an assignment of lease for any of Flour City's bakery locations. Also unlike Dunkin' Donuts, Bruegger's offers no evidence to support its claim that it will suffer irreparable harm or that a monetary award will not provide adequate relief. In sum, Bruegger's failed to carry its evidentiary burden to show irreparable harm.

Painting with a broad brush, Bruegger's also argues that New York courts routinely order specific performance in cases involving a breach of contract related to real property. However, the New York cases cited by Bruegger's involve breaches of contract relating to the *sale* of real estate. *See Balaber-Strauss v. Markowitz (In re Frankel)*, 191 B.R. 564, 572 (Bankr. S.D.N.Y. 1995) (stating that the "law in New York is clear that a seller is entitled to the remedy of specific performance if the purchaser breaches a contract to purchase real estate"); *Woodruff v. Germansky*, 233 N.Y. 365 (N.Y. 1922) (stating that actions compelling specific performance of contracts to purchase land have always been sustained); *Crary v. Smith*, 2 N.Y. 60 (N.Y. 1848) (upholding a lower court's decree for specific performance of a real estate contract). While it is beyond doubt that New York courts often grant specific performance of contracts for the sale of real estate, the cases cited by Bruegger's are distinguishable because this case does not involve a contract for the sale of real estate. Nor does it involve a franchisor holding a valid written assignment of lease, taken as collateral security in the event of breach by the franchisee. *See Dowco*, 1998 U.S. Dist. LEXIS 4526, at *2.

Bruegger's reliance on *In re Ground Round, Inc.*, 482 F.3d 15 (1st Cir. 2007) is also misplaced. There, the debtor leased real property on which it operated a restaurant. *Id*. at 16-17. The landlord subsequently obtained a Pennsylvania liquor license and transferred title to the

liquor license to the debtor.  *Id.* at 17.  The parties executed an assignment agreement that obligated the debtor to return the liquor license to the landlord on termination of its lease.  *Id.* After it filed for bankruptcy, the debtor rejected the lease but claimed a right to retain the liquor license.  *Id.*  The landlord brought an adversary proceeding, seeking specific performance of the assignment agreement and return of the liquor license.  *Id.*  The Bankruptcy Appellate Panel affirmed the Bankruptcy Court Order granting specific performance and directing the debtor to return the liquor license.  *Id.*

On appeal, the First Circuit affirmed.  The Circuit Court noted that, under Pennsylvania law at that time, a contract-claim litigant could not have obtained a lien on the liquor license.  *Id.* at 20.  The landlord in *Ground Round* was, for purposes of Pennsylvania law, the holder of an ownership interest in the debtor's liquor license.  *Id.* at 19-21.  The Circuit Court found that "*[w]here a claimant holds something akin to a property right* in something held by the debtor, that right survives bankruptcy and remains enforceable to recover the property from the estate." *Id.* at 19 (emphasis added).  Therefore, Ground Round could not avoid the landlord's ownership interest in the liquor license under section § 544 of the Bankruptcy Code.  *Id.* at 20.  The First Circuit additionally observed that "*secured* creditors regularly get back *secured property* or its equivalent to pay their claims."  *Id.* (emphasis added).

*Ground Round* is factually distinguishable from this case.  Bruegger's does not have an ownership interest, something akin to an ownership interest, or a security interest in Flour City's leases or personal property.  Bruegger's has not demonstrated anything other than a contract claim with respect to those items under the Franchise Agreements.  More importantly, Bruegger's has failed to prove the basic elements of its claim for specific performance—no

adequate remedy at law and irreparable harm.  As a result, Bruegger's motion seeking to compel assignment of Flour City's leases and sale of Flour City's personal property is **DENIED**.

B.     <u>**Flour City's Motion to Sell Substantially All of Its Assets Free and Clear of Liens**</u>

The underlying causes of Flour City's financial pickle are, perhaps, a matter for the Court to address another day.[13]  Whether Flour City should be permitted to address its financial tight-spot through the sale of substantially all of its assets, free and clear of liens, is the issue presently before the Court for determination.  Several secured creditors, the franchisor, and the UST have strenuously objected to the proposed sale on *Lionel* grounds.  After consideration of the evidence introduced by Flour City and those parties over the course of a lengthy two-day trial, for the reasons that follow, the Court finds that Flour City has failed to carry its evidentiary burden of proof under *Lionel* and under 11 U.S.C. §§ 363(b), 363(f)(2), and 363(f)(3).

1.     *The evidence does not demonstrate a sound business reason to justify the sale of substantially all of Flour City's assets.*

Section 363(b) of the Bankruptcy Code authorizes a Chapter 11 debtor to use, sell, or lease property of the estate outside the ordinary course of business.  11 U.S.C. § 363(b).  "Because a § 363 sale is not subject to the requirements of disclosure and voting that attend a plan confirmation process, its use is circumscribed."  *In re Spa Chakra*, No. 09-17260, 2010 Bankr. LEXIS 543, at *12 (Bankr. S.D.N.Y. Mar. 5, 2010).  The concern raised by such pre-confirmation sales is that they risk "deny[ing] creditors the statutory protections they would otherwise receive through the Chapter 11 confirmation process by establishing the  terms of a *sub rosa*, or perhaps more accurately, *de facto*, plan in connection with the sale."  *In re*

---

[13]     *See Flour City Bagels, LLC v. 683 PVR, LLC et al.*, Case No. 16-2012-PRW (Bankr. W.D.N.Y. 2016)

*Tempnology*, 542 B.R. 50, 65 (Bankr. D.N.H. 2015) (citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007)); 3 *Collier on Bankruptcy* ¶ 363.02[3] (16th ed.) ("A sale of the major part of the estate under section 363 may have the practical effect of resolving issues that would ordinarily be addressed in connection with confirmation of a plan. Thus, there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process.").

In determining whether to approve a proposed sale under § 363(b), the Court must "expressly find *from the evidence presented before him at the hearing* a good business reason to grant such an application." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (emphasis added); *see also In re Family Christian LLC*, 533 B.R. 600, 626 (Bankr. W.D. Mich. 2015); *In re Global Crossing Lt'd*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Condere Corp.*, 228 B.R. 615, 628 (Bankr. S.D. Miss. 1998). The debtor carries the burden of demonstrating by a preponderance of the evidence that a sale outside the ordinary course is justified, but an objecting party is also required to produce evidence with respect to its objections. *Lionel*, 722 F.2d at 1071. The Second Circuit has instructed that relevant factors for the bankruptcy court to consider in evaluating whether a debtor has exercised sound business judgment include:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*Id.* Although the Court should not substitute its judgment for that of the debtor-in-possession, it "must not blindly follow the hue and cry of the most vocal special interest groups; rather [the Court] should consider all salient factors pertaining to the proceeding and, accordingly, act to

39

further the diverse interests of the debtor, creditors, and equity holders, alike." *Id.*; *see* 3 *Collier on Bankruptcy* ¶ 363.02[4] (16th ed.).

The Second Circuit's *Lionel* factors are not exhaustive. *Lionel*, 722 F.2d at 1071. Courts have identified additional factors as instructive in evaluating a proposed sale, including "(i) whether adequate and reasonable notice has been provided to parties in interest, including full disclosure of the sale terms and the debtor's relationship with the purchaser, (ii) whether the sale price is fair and reasonable, and (iii) whether the proposed buyer is proceeding in good faith." *Family Christian, LLC*, 533 B.R. at 626; *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *Condere*, 228 B.R. at 631.

In conducting an auction sale, debtors have a fiduciary duty to maximize the value of their assets. *Lawsky v. Condor Capital Corp.*, No. 14 CIV. 2863 (CM), 2015 U.S. Dist. LEXIS 96347, at *24 (S.D.N.Y. July 21, 2015); *Family Christian, LLC*, 533 B.R. at 622. This fiduciary duty does not mandate that debtors "mechanically accept" the bid with the highest dollar amount. *Lawsky,* 2015 U.S. Dist. LEXIS 96347, at *24; *Family Christian, LLC*, 533 B.R. at 622. Rather, a fiduciary should weigh other factors, "such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Family Christian, LLC*, 533 B.R. at 622. In sum, the debtor must demonstrate that the purchase price is not merely the highest dollar amount—but the highest *and best* offer. *Id.* at 626; *see Lawsky*, 2015 U.S. Dist. LEXIS 96347, at *24.

The consideration of the good faith of the buyer is particularly relevant in a sale to an insider. "Where a proposed sale would benefit an insider of a debtor, the court is required to give heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." *Family Christian, LLC*, 533 B.R. at 622 (citing *In re*

40

*Ricker & Assocs., Inc.*, 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002)); *In re Tempnology*, 542 B.R. 50, 65 (Bankr. D.N.H. 2015). Further still, if the sale will benefit an insider entity that *controls* the debtor, "the court must carefully consider whether it is also appropriate to defer to their business judgment." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009). And, in this Court's view—because Canal is an insider that controls Flour City—the absence of "bad faith" does not require the Court to conclude that Canal acted in "good faith" for purposes of § 363(b), under *Lionel*.

i. <u>Is the sale price fair and reasonable?</u>

Flour City submits that the $5 million sale price is fair and reasonable because it exceeds the value of the assets set out in its schedules—consisting of cash, accounts receivable, inventory, equipment, furniture and fixtures, having a book value of approximately $2.9 million. (ECF No. 518 at 6; ECF No. 143, Schedule A/B). Further, as Flour City posits, its bakery leases have a negative value to the Estate, pointing to Mr. Koeppel's trial testimony. (ECF No. 518 at 6). Given the assets that are excluded from the sale (avoidance actions against Flour City's former officers, for example), Flour City argues that the $5 million purchase price exceeds the value of the assets that Canal proposes to purchase. (*Id.* at 6-7).

However, Flour City has not presented any direct evidence of the value of Flour City's assets. No appraisals were offered for the assets being sold. Flour City offered only the book value of its assets, derived from Flour City's books and records—which were, in Szekelyi's view, "really deplorable." (Sale Hr'g Tr. at 105:15-23). Szekelyi's testimony regarding the $2.9 million value revealed that the number is a reasoned guess, at best. (*See* Sale Hr'g Tr. at 154:13-18). The $2.9 million valuation is further clouded by the fact that Premier—an interested party that withdrew its unqualified bid before the auction—offered as much as $7.5 million for the

41

Debtor's assets. (Debtor Ex. 12). Flour City argues that Premier's bid was not qualified, so it doesn't matter. But, Bruegger's was willing to pay $20 million to buy substantially all of Flour City's assets in October of 2014. (Debtor Ex. 19). These facts suggest that the $2.9 million asset value offered by Flour City is suspect—and low. The Court gives little weight to the book value of the assets offered by Flour City as evidence of value.

The only other evidence of value offered at trial was Mr. Koeppel's valuation of Flour City's leases in isolation. (*See* Sale Hr'g Tr. at 262-63, 296-97). The Court gives little weight to that testimony—in light of Mr. Koeppel's acknowledgement that he had never before been retained solely to value leaseholds; he had only valued leaseholds previously as part of valuing a family of intangible assets. (*See* Sale Hr'g Tr. at 262:24-263:2, 263:24-264:3). Koeppel's testimony was that the leaseholds are one part of the valuation equation, and he stated that to look at one asset in isolation "may be misleading." (*See* Sale Hr'g Tr. at 308:7-12). The Court finds that Flour City failed to offer any direct evidence of the value of the assets that it proposes to sell to Canal.

Even if the Court accepted Flour City's $2.9 million figure as the value of the Debtor's assets, Flour City proposes to sell to Canal more than just the hard assets listed in Flour City's schedules. The APA includes releases of all actions of any nature against Canal, United, or any of their former or current officers, directors, employees, or representatives, as well as releases of any Chapter 5 claims against Flour City's suppliers, vendors, and landlords under the assumed contracts. (ECF No. 404, Ex. 1 ¶¶ 1.8.3, 1.8.4). The value of these releases and Chapter 5 claims is unknown. No evidence has been offered regarding the existence of claims covered by the releases, the amount in controversy, or the likelihood that Flour City would prevail. *See In re On-Site Sourcing, Inc.*, 412 B.R. 817, 825 (Bankr. E.D. Va. 2009) (finding that the lack of

information about the claims being released, their value, and the likelihood that the Debtor would succeed on them shows the lack of a sound business reason).  More importantly, Flour City—as a debtor under Chapter 11—has not even hinted at any business justification for it to give those releases.  In fact, Flour City's Sale Motion is silent as to releases in favor of United and Canal.  The motion states only that the "APA does not require the release of any claims *against* the Debtor as a condition of the sale."  (ECF No. 518 at 24) (emphasis added).  However, the releases of Flour City's lenders, United and Canal, as well as Chapter 5 claims may convey away valuable Estate assets with no business reason offered or any proof of value.  Because no reason for the releases is given, and because there is no evidence concerning the value of those releases, the Debtor has not met its burden of proof on the issue.

Finally, the cash component of the Canal bid raises serious concerns that the sale, if approved, would result in Flour City being rendered administratively insolvent.  Flour City asserts that $1.3 million in cash will cover its closing costs and administrative expenses, and leave the Flour City Estate with a positive ending cash balance of $32,326.  (*See* ECF No. 456 at 3; Debtor Ex. 14; Sale Hr'g Tr. at 40:8-18, 129:11-130:23).  However, as the UST argues, Flour City's professional fees to date will put Flour City well over the $210,000 professional fee carve-out that Flour City used to arrive at the $1.3 million figure.  (ECF No. 516 ¶¶ 36-42).  After Flour City's projected payment of professional fees through June 30, 2016,[14] the remaining

---

[14]    Flour City's Exhibit 13, admitted at trial, projects that Flour City will pay $575,000 to professionals on August 19, 2016.  Flour City's professionals have submitted Applications for Compensation for the interim period of March 2, 2016 to June 30, 2016—which fees total $734,490.58.  (*See* ECF Nos. 473, 480, 485, 489, 507, 508; *see also* ECF No. 516 ¶ 37).  Additional UST quarterly fees of $13,500 are due, bringing the grand total of professional fees to $747,990.58.  (ECF No. 516 ¶¶ 38-39).  When the $575,000 projected payment is subtracted from the total fees of $747,990.58, Flour City still owes $172,990.58 to professionals for the

43

professional fee carve-out dwindles down to $37,009.42—and that's before July professional fees are considered. (*Id.* ¶ 42). Given the mammoth amount of legal work done in the month of July alone—including participating in a lengthy two-day trial and the hours necessary for counsel to prepare for that trial—the Court seriously doubts that $37,009.42 will cover Flour City's professional costs. In light of the substantial risk that the $1.3 million in cash that Canal offers to pay will render Flour City administratively insolvent, the Court finds that the structure of the sale is not reasonable or supported by a good business justification.

### ii.    *Is there evidence of a need for speed?*

Several *Lionel* factors urge the Court to consider the exigency of a § 363 sale—including the amount of elapsed time since the filing and whether the asset is increasing or decreasing in value. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). These factors recognize the inherent advantages and disadvantages that an expedited sale under § 363 can pose. "'The need for expedition, however, is not a justification for abandoning proper standards.'" *Lionel*, 722 F.2d at 1071 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968)). "The Court must be concerned about a slippery slope. Not every sale is an emergency . . . ." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009) (finding no need for speed where there was no evidence that the assets were perishable or that any value would be lost through delay to permit plan confirmation).

Here, the Chapter 11 case has been pending for less than six months, and the auction was conducted only four months after filing. Flour City asserts that the "on-going expenses of operating in chapter 11, coupled with the steadily depreciating Assets and the need for capital

---

period through June 30, 2016. That leaves only $37,009.42 of the $210,000 professional fee carve-out to cover remaining legal expenses that accrue after June 30, 2016.

44

improvements at most of the Debtor's bakeries . . . will likely result in an overall future decline in the value of the Assets." (ECF No. 518 at 8; *see* Sale Hr'g Tr. at 216:14-25). Steady depreciation over time—a trend inherent in many Chapter 11 cases—does not itself demonstrate an exigent need for speed, however. Nor is the Court convinced that Flour City's assets are rapidly depleting. In fact, the evidence at trial showed that Flour City's operations and profitability have improved since Canal assumed control of Flour City, and Flour City has been stabilized in many respects. (*See* Sale Hr'g Tr. at 358-60). The Court is not concerned about any looming market or business conditions that would qualify this sale as an emergency or that would cause a marked decrease in the value of Flour City in the near future. *See Gulf Coast Oil*, 404 B.R. at 423 (noting an example of exigency when "immediate control by the purchaser was necessary to complete existing contracts to avoid massive loss of value").

    *iii.*     <u>Is Canal a good faith purchaser?</u>

Although "good faith" is not defined in the Bankruptcy Code, courts generally look to the purchaser's conduct during the course of the sale proceedings. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997); *see also In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002). "A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' . . . That is, the good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale." *Gucci*, 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). "If the court perceives any degree of fraud, unfairness or mistake with the sale, including any flaws with an auction process, the court should assess the impact of these factors

45

on the sale when the offer is compared to the court's finding of valuation of the assets to be sold." *In re Family Christian LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015).

Bruegger's, MRM, and the UST share a serious concern: Canal, as successful bidder at auction, also exercises complete control over Flour City, the seller. (ECF No. 438 ¶ 21; ECF No. 429 ¶¶ 8-10; ECF No. 517 ¶¶ 52-68). The objecting parties contend that Coyne's irreconcilable conflict of interest—as the sole representative of both Flour City and Canal—prevented him from negotiating the sale of Flour City in good faith. (*See* ECF No. 438 ¶ 21; ECF No. 429 ¶¶ 8-10; ECF No. 517 ¶¶ 52-68). The objections also question Coyne's business judgment in assessing the competing bids because he ignored the possible legal impediments presented by Bruegger's turn-over motion and the non-compete provision in the Franchise Agreements; he selected a bid that appears to have underfunded the cash component necessary to avoid administrative insolvency; and Coyne mechanically accepted the highest dollar amount as automatically being the highest and best offer. (*See* ECF No. 438 ¶ 21; ECF No. 429 ¶¶ 8-10; ECF No. 517 ¶¶ 52-68). Bruegger's also complains that it was not invited to meet with Flour City's professionals—as was Canal's representative—to discuss the relative merits of (and risks posed by) each of the bids. (ECF No. 517 ¶ 54).

As an initial matter, the Court finds that the marketing efforts on behalf of Flour City were not unfair or fraudulent. The testimony showed that PCR aggressively marketed the assets and that all parties associated with Flour City—Coyne included—actively helped in these marketing efforts with the hope of finding a third-party purchaser and maximizing the value of Flour City. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009) ("The principal justification for § 363 sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit."). As for the auction sale itself, however, the Court

46

questions the fairness of the negotiations between Flour City and Canal—to the exclusion of Bruegger's—which ultimately led to the selection of Canal's bid as the highest and best offer.

While Coyne and his team are to be commended for the major improvements made in Flour City's stability and profitability during the last year, the Court doubts that the interests of Flour City and Canal truly align *with respect to the sale of Flour City to Canal*. As in *Gulf Coast*, the Court considers, as a relevant factor in assessing whether the debtor exercised sound business judgment, whether Coyne—as a fiduciary to Flour City—was truly disinterested. *See Gulf Coast Oil Corp.*, 404 B.R. at 424. The Court has little hesitation in accepting that the interests of Canal and Flour City would align with respect to the sale of Flour City to a *disinterested third party*—with the goal being to maximize the value to Flour City. Unfortunately, no disinterested, third-party Qualified Bidder rose to the top. As Coyne's testimony revealed, he reluctantly placed a bid "solely for the purpose of recovering principal," and he did not increase the cash component of the Canal bid because he did not want do more than what "was absolutely necessary for the recovery of principal." (Sale Hr'g Tr. at 455:15-21). By selecting Canal's bid as highest and best, Coyne has placed Flour City at risk of administrative insolvency—a very serious risk at that. Conversely, the Bruegger's all-cash bid of $4.75 million would have eliminated that risk, but was unpalatable to Flour City—and Canal—for obvious reasons.

The evidence at trial demonstrates that Coyne may have mechanically accepted the highest dollar amount bid as representing the highest "and best" offer—by failing to even consider the risk of Bruegger's lien litigation and possible litigation related to the non-compete agreements. In addition to considering the fact that the $5 million Canal bid was mathematically greater than the $4.75 million Bruegger's bid, Coyne and Flour City's professionals considered

47

the desirability of Canal paying a cash deposit and paying the first $50,000 of the transfer and sales taxes in connection with the sale. (Sale Hr'g Tr. at 379:5-18, 126:18-20). This testimony revealed that they were concerned about making Canal's offer consistent with Bruegger's offer. (Sale Hr'g Tr. at 54:1-4). However, Coyne admitted that he did not weigh the risk of Bruegger's lien claims in selecting Canal's offer because he "always just discounted it," based on his belief that the Estoppel Certificate foreclosed Bruegger's challenge. (*See* Sale Hr'g Tr. at 445:6-20). The Court doubts whether a truly disinterested debtor would have brushed off its franchisor's looming legal challenge so lightly. Coyne's testimony showed that he did not fully consider the uncertainties of litigation that potentially rendered Canal's offer less appealing—and maybe not the highest "and best." *See Family Christian, LLC*, 533 B.R. at 622.

In the Court's view, Coyne's selection of the Canal bid as the highest and best offer was likely colored by his bias in favor of Canal, making the negotiation between Flour City—acting through Coyne—and Canal—also acting through Coyne—unfair. This is not a situation where an insider was merely the buyer. This is a situation where the insider was both the buyer and the entity in complete control of the seller. Based on the evidence presented at trial, the Court finds that Flour City has not satisfied its burden, under a heightened scrutiny standard, to show by a preponderance of evidence that the insider-purchaser acted in good faith. *See id.* at 628-29.

### iv.  *Was adequate notice given?*

Under 11 U.S.C. § 1125, the proponent of a Chapter 11 plan must provide creditors and parties in interest a disclosure statement containing adequate information to allow the holder of a claim to make an informed judgment about the plan. "[B]ecause the proposed sale of substantially all of the Debtor's assets is the functional equivalent of a plan, the creditors and

48

parties in interest [are] entitled to the functional equivalent of a disclosure statement." *In re*
*Tempnology LLC*, 542 B.R. 50, 65 (Bankr. D.N.H. 2015).

Flour City complied with the requirements of Rules 2002(a) and 6004(a) FRBP in
noticing the Sale Motion at least 21 days in advance of the hearing.[15] (*See* ECF No. 404). But
the *content* of Flour City's Sale Motion left certain key terms undisclosed. The Sale Motion did
not mention the delivery of releases in favor of United and Canal, or the reason for those
releases, or the value of those releases. The APA attached to the motion does provide for those
releases, as a condition of sale. (*Id.*, Ex. 1).

Additionally, the motion did not disclose Canal's agreement to pay an extra $300,000 to
Flour City's counsel, for distribution to unsecured creditors. (*See* ECF No. 404). Were Flour
City to have proposed a Chapter 11 sale plan, it would have been required to disclose this
payment—or so-called "gift"—to unsecured creditors, and the absolute priority rule would have
no doubt been raised as an objection. Courts faced with so-called "gifts" to the unsecured
creditors class in the context of § 363(b) sales have reached different results about whether such
gifts create an impermissible *sub rosa* plan. *Compare In re On-Site Sourcing, Inc.*, 412 B.R.
817, 826-28 (Bankr. E.D. Va. 2009) (invalidating a proposed gift to unsecured creditors because
the "end result . . . would have been to divert a part of the proceeds of the sale . . . to the
detriment of administrative expense and priority creditors and thereby allow the general
unsecured creditors to avoid some of the vicissitudes of the chapter 11 process or a conversion to
chapter 7"), *with In re LCI Holding Co.*, 802 F.3d 547, 555-56 (3d Cir. 2015) (permitting an

---

[15]       The UST objected to the adequacy of notice, arguing that the time to respond to the Sale
Motion fell over the July 4th holiday weekend and that parties continued to file substantive
papers up until the date of the trial, depriving the UST of an adequate opportunity to review or
respond (ECF No. 516 at 18-19). The *amount* of notice complied with Rule 6004(a) FRBP.

unsecured creditors' trust, funded by the purchaser, reasoning that the fund was not given in exchange for Estate property because the trust was not property of the Estate). While the Court need not presently decide the propriety of Canal's proposed "gift" to unsecured creditors—and its consequence if evidence of a *sub rosa* plan—the Court finds that the absence of any disclosure of that proposed payment by Flour City in the Sale Motion is problematic. Flour City cannot claim that it did not know about the side-deal between Canal and the Committee, struck after Canal's bid was selected as the highest and best. Mr. Coyne was involved in negotiating that side-deal for Canal's benefit, while also serving as a fiduciary to Flour City. Even after the "gift" was mentioned by the Committee in its support of the Sale Motion, no information was provided about how, when, and by what means the payment would be made—information the Court would have expected to be the subject of evidence at trial.

     *v.*     <u>*Was sound business judgment exercised?*</u>

Applying all of the *Lionel* factors—which require Flour City to provide evidence at the § 363(b) sale hearing demonstrating a good business reason to permit the sale—the Court doubts Flour City's business judgment in selecting the Canal bid as the highest and best. To quote the *Gulf Coast* court, *Lionel* "requires a showing of a business justification for the § 363(b) sale prior to plan confirmation, not merely a showing that it doesn't matter." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 428 (Bankr. S.D. Tex. 2009). This Court agrees with the concerns expressed by the *Gulf Coast* court, as applied to the proposed sale of Flour City's assets:

> In this case, the essence of the proposed transaction is a foreclosure supplemented materially by a release, by assignment of executory contracts (but only the contracts chosen by the secured lender), by a federal court order eliminating any successor liability, and by preservation of the going concern [free and clear of liens].

. . .

Not only does the proposed sale include the "crown jewels" (such as they are) the proposed sale includes all of the other jewelry and assets. If the Court approves the sale, the case will be dismissed . . . . The only effect of the bankruptcy process would be to transfer the debtors' assets to its secured creditor with benefits that the creditor could not achieve through foreclosure.

*Id.*

So too with Flour City, but perhaps more so. Canal fully controls Flour City. It filed the bankruptcy in Flour City's name, decided to sell substantially all of Flour City's assets, selected its own bid as highest and best on Flour City's behalf, and seeks to achieve through a § 363(b) sale in bankruptcy, that which it could not achieve in an Article 9 sale under the U.C.C. The Court finds that for the reasons stated, Flour City has failed to carry its burden to introduce evidence to prove the value of Flour City's assets in proportion to the proposed sale price, the business justification for and value of the releases in favor of Canal and United contained in the APA, the need for speed or that speed has helped in maximizing the value of Flour City's assets, that the Debtor's assets are declining in value, the good faith of Canal in acting as both the buyer and seller of Flour City's assets, and that adequate notice was given to all parties of all substantive terms of the sale. The *Lionel* factors weigh against the Debtor and in favor of the objecting parties.

The absence of evidence necessary to permit a sale under § 363(b) does not result in Bruegger's back-up bid rising to the top, however. Just as there is insufficient evidence to demonstrate a good business justification for a sale to Canal, that lack of evidence under *Lionel* also prevents the Court from approving the sale to Bruegger's. It seems that Bruegger's knows

51

that its bid must fail for the same reason that the Canal bid must fail.[16]  There is no evidence before the Court to prove the business justification for the sale by a preponderance of the evidence—and that lack of evidence also prevents the Court from approving a sale to Bruegger's under the *Lionel* test.

Flour City's Sale Motion is, therefore, **DENIED**, under 11 U.S.C. § 363(b).

**2.      *Even were the sale approved under 11 U.S.C. § 363(b), Flour City has failed to demonstrate grounds that would permit sale free and clear of liens under 11 U.S.C. § 363(f).***

In addition to seeking to sell substantially all of Flour City's assets out of the ordinary course of business under § 363(b), Flour City seeks that sale to be "free and clear of all liens, claims, interests, charges and encumbrances," under 11 U.S.C. § 363(f).  (ECF No. 404 ¶ 52). Providing only cryptic information to affected parties, the motion states:

> [T]he Debtor believes that it has satisfied one or more conditions of the conditions set forth in section 363(f).  In particular certain creditors . . . have consented to a proposed sale free and clear of liens, claims and encumbrances [under] 11 U.S.C. § 363(f)(2).  The Debtor will continue to negotiate with other Secured Creditors concerning their respective claims pending the Sale Hearing. *To the extent such creditors do not consent explicitly or implicitly, the Debtor believes that the sale will satisfy one or more of the factors in section 363(f)* . . . .

(ECF No. 404 ¶ 53) (emphasis added).

But which ones?  By way of both pre-trial and post-trial submissions, the UST has repeatedly objected to the adequacy—and lack of specificity—of the information in the Sale Motion, and that those defects undercut the adequacy of "notice" required under § 363(b) and Rule 6004 FRBP.  (ECF Nos. 438, 516).  The Sale Motion only makes reference to § 363(f)(2) as the specific basis for the proposed sale, free and clear of creditors' liens or interests.  (ECF No.

---

[16]      Bruegger's devotes only one sentence of its opposition to the Sale Motion to ask the Court to approve its back-up bid instead of Canal's bid.  (ECF No. 517 at 36).

404 ¶ 53). Flour City's post-trial brief also relies heavily on § 363(f)(2)—claiming all affected creditors gave consent. (ECF No. 518 at 19-21). In two sentences in its post-trial brief, Flour City tacks-on § 363(f)(3)—comparing the sale price to the aggregate value of all liens. (*Id.*). And in one sentence, Flour City cites § 363(f)(4)—arguing, as to Bruegger's only, that Bruegger's interest is subject to *bona fide* dispute. (*Id.*). If the claim of MRM is similarly disputed, that fact has never been mentioned in the Sale Motion, in the evidence at trial, or in Flour City's post-trial brief. Because, under even a most generous reading of the Sale Motion, the Debtor limited its grounds to sell free and clear of all non-Bruegger's creditor claims to § 363(f)(2) and (f)(3), the Court will limit its consideration to those grounds. Creditors were not apprised by Flour City in the Sale Motion of any other grounds under § 363(f), so any such grounds have been waived.

Section 363(f) of the Bankruptcy Code permits a sale of property under 11 U.S.C. 363(b) "free and clear of any interest in such property" only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The question becomes whether Flour City carried its burden of proving the existence of grounds to sell free and clear of liens under 11 U.S.C. § 363(f)(2) or (3). The Court finds that the answer is no.

53

i.  *Section 363 (f)(2)*

Turning first to § 363(f)(2), Flour City argues that a sale "free and clear" is permitted because United, Canal, and New York State Department of Taxation have expressly consented to the sale. (ECF No. 518 at 19). But Flour City does not have the affirmative consent of all its secured creditors, so it takes other paths to try to convince the Court that the requirements of § 363(f)(2) have been satisfied.

First, Flour City submits that Lakeland Bank should be deemed as having impliedly consented to the sale, because it did not object. (*Id.* at 19-20). Flour City invites the Court to join those courts that hold that silence constitutes implied consent to a sale free and clear of interests. *See In re GCS, Inc.*, 453 B.R. 132 (Bankr. S.D.N.Y. 2011); *In re Borders Grp., Inc.*, 453 B.R. 477 (Bankr. S.D.N.Y. 2011); *In re Arena Media Networks, LLC*, No. 10-10667(BRL), 2010 Bankr. LEXIS 2352 (Bankr. S.D.N.Y. Mar. 22, 2010). The Court declines the invitation. Instead the Court finds the analysis adopted by the Court in *In re Arch Hospitality, Inc.*, 530 B.R. 588 (Bankr. W.D.N.Y. 2015) more reasoned and persuasive. "Consent and failure to object are not synonymous." *Arch Hospitality, Inc.*, 530 B.R. at 591. The plain language of 11 U.S.C. § 363(f)(2) requires that the proponent of a sale free and clear of an interest in the property to be sold obtain the consent of the holder of that interest.

Next, Flour City argues that U.S. Foods only objects to the absence of a sale provision ensuring full payment of all § 503(b)(9) claims—which Flour City says "*should be* paid in full as an administrative expense." (ECF No. 518 at 20) (emphasis added). Flour City asserts that the U.S. Foods objection has thus been "eliminated." (*Id.*). Alternatively, Flour City argues that the U.S. Foods objection to the sale was filed late and should be disregarded by the Court. (*Id.*). Although U.S. Foods' objection was limited to the § 503(b)(9) issue, it did not expressly consent

54

to the sale of Flour City's assets free and clear of its interest. U.S. Food's failure to object on specific § 363(f)(2) grounds is not equivalent to its consent.

Similarly, the Debtor has the secured claim of MRM to address. In its original schedules, Flour City listed MRM as holding a secured claim in the amount of $700,000—listed as disputed. (ECF No. 143, Schedule D). Flour City amended its schedules to list the MRM secured claim in the amount of $350,000. (ECF No. 322, Schedule D). There was no evidence offered at trial as to the nature of the MRM secured claim or the basis for any dispute concerning that claim. In its post-trial brief, Flour City simply omits any mention of MRM in its § 363(f) analysis and argument. (ECF No. 518 at 19-21). However, MRM objected to Flour City's Sale Motion. (ECF No. 429). While Flour City responded to the MRM objection, that response did not dispute the MRM claim and merely attempted to rebut MRM's objections to the § 363(b) Sale Motion. (*See* ECF No. 456). MRM has not consented to a sale; it filed objections to the sale—and certainly did not consent to a sale being free and clear of its lien. (*See* ECF No. 429).

Finally, Flour City must deal with the claim of New York State Department of Taxation. After the close of proof at trial, counsel to Flour City advised the parties and the Court that "[i]n regard to New York State sales tax, we have received the affirmative consent. No opposition to the sale." (Sale Hr'g Tr. at 499:12-14). On July 25, 2016, counsel then filed a letter on the case docket, including an email from New York State Department of Taxation. (ECF No. 467). While that email is not in evidence, its content demonstrates that while New York State may have consented to the sale, *it did not consent to the sale being free and clear of its lien*. New York State expressly indicated that its consent to the proposed sale was conditioned on "valid liens attach[ing] to the sale proceeds in the order of their priority." (*Id.*). Consent to the sale is not the functional equivalent of consent to the sale being free and clear of liens. *See* 3 *Collier on*

55

*Bankruptcy* ¶ 363.06[3] (16th ed.). Flour City did not introduce evidence to prove that the sale would generate sufficient proceeds—after payment of closing costs and administrative expenses—for the New York State tax lien to attach to anything. To compound the problem, no one has addressed the possibility that, because United, Canal, and Bruegger's failed to properly perfect a security interest in Flour City's leases, the New York State tax lien may have leap-frogged the other creditors and attached to Flour City's leases pre-petition. Flour City has failed to carry its burden of proving that New York State consented to the sale free and clear of its $1 million tax lien.

To summarize, U.S. Foods, MRM, and New York State have not consented to the sale being free and clear of their liens. The Sale Motion suggested that negotiations would lead to consent by trial. (ECF No. 404 ¶ 53). As to Lakeland Bank, U.S. Foods, MRM, and New York State, that did not happen. Flour City has failed to introduce proof that it has the expressed consent of the holders of interest in the property to be sold, as required by the plain language of 11 U.S.C. § 363(f)(2).

### ii. *Section 363(f)(3)*

The fall-back position taken by Flour City in an effort to find statutory support for the proposed sale free and clear of liens is 11 U.S.C. § 363(f)(3), which Flour City mentioned for the first time in a very short paragraph buried in its post-trial brief. (*See* ECF No. 518 at 20-21).[17] Under 11 U.S.C. § 363(f)(3), a sale under § 363(b) can be made free and clear of liens in the

---

[17] The Court doubts that affected parties were on notice of Flour City's fall-back position to support its effort to sell free and clear under 11 § 363(f)(3), if (as has happened) consents were not given as required by § 363(f)(2). Tellingly, none of the objecting parties addressed it in their responding papers or their post-trial briefs. The UST's challenge to the adequacy of notice given by Flour City in the Sale Motion seems to be well-taken.

property to be sold if "the price at which such property is to be sold is greater than the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(3). Flour City asserts that the competitive bidding process established the actual market value of its assets as $5 million—so value should be of no concern to the Court. (ECF No. 518 at 20). As Flour City would have it, the aggregate value of all liens on the property is not more than $5 million. (*Id.* (citing *In re Boston Generating, LLC*, 440 B.R. 302, 331-33 (Bankr. S.D.N.Y. 2010)). Flour City asks the Court to find the value of liens on the property under 11 U.S.C. § 506(a)—so that the economic value of the liens, rather than their face amount, controls. *See Boston Generating*, 440 B.R. at 331-33.

The amount of debt secured by liens on Flour City's property is over $11 million. (ECF No. 322, Schedule D). The amount bid for Flour City's property was $5 million. Flour City's argument that valuation under 11 U.S.C. § 506(a) should be used to determine the amount of allowed secured claims in the context of a sale free and clear of liens under § 363(f)(3) is not without precedent. Section 363(f)(3) refers to the "value of all *liens*"—causing one court to wonder whether the phrase "is simply an unfortunate deviation from the Code's general preference to refer to claims, and not liens, or whether it has some other significance." *Clear Channel Outdoor v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 39 (B.A.P. 9th Cir. 2008). Some courts have found that because a secured claim is a form of "lien," a § 363(b) sale may be accomplished free and clear of liens, if those liens are not supported by the value of the property being sold. *See In re Beker Indus. Corp.*, 63 B.R. 474, 476-77 (Bankr S.D.N.Y. 1986); *see also In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990). The courts adopting this view seem to take a results-oriented approach to facilitate § 363(b) sales.

Other courts disagree with this results-oriented approach, based on the plain language of § 363(f)(3). *See PW, LLC*, at 40; *In re Feinstein Family P'ship*, 247 B.R. 502 (Bankr. M.D. Fla. 2000); *see also* 3 *Collier on Bankruptcy* ¶ 363.06[4] (16th ed.). As the Ninth Circuit Bankruptcy Appellate Panel explained, in rejecting the approach of the *Beker Industries* court, "[t]his reading expands § 363(f)(3) too far. It would essentially mean that an estate representative could sell estate property free and clear of any lien regardless of whether the lienholder held an allowed secured claim. We think the context of paragraph (3) is inconsistent with this reading. If Congress had intended such a broad construction, it would have worded the paragraph differently." *PW, LLC*, 391 B.R. at 40. The Ninth Circuit B.A.P. explained, the plain language of § 363(f)(3)—which provides that the price must be "*greater than* the aggregate value of all liens"—dictates this result. *Id.* If the "aggregate value of all liens" means the total amount of allowed secured claims as used in 11 U.S.C. § 506(a), "then [§ 363(f)(3)] could *never* be used to authorize a sale free and clear in circumstances like those present here; that is, when the claims exceed the value of the collateral that secures them." *Id.* In such cases, the amount of allowed secured claims will only ever *equal* the sale price. *Id.* The Court is persuaded by and agrees with the approach taken by the 9th Circuit B.A.P. in *PW, LLC* and by the court in *Feinstein Family Partnership* as being consistent with the plain language used by Congress in § 363(f)(3). The Court holds that 11 U.S.C. § 363(f)(3) does not authorize a sale, free and clear of liens, if the price for which the property is to be sold is equal to or less than the aggregate amount of all claims held by creditors with liens in the property being sold.

Because Flour City has not carried its burden of proof under either 11 U.S.C. § 363(f)(2) or (f)(3), Flour City's motion to sell property—free and clear of all liens encumbering that property—is **DENIED**.

58

# IV.

## CONCLUSION

Because Canal and United failed to perfect their security interest in Flour City's leases, Bruegger's motion for a determination that United and Canal do not have pre-petition liens on Flour City's leases is **GRANTED**. However, because Bruegger's likewise failed to perfect *its* interest in the leases or personal property—and because Bruegger's has demonstrated no right to specific performance—Bruegger's motion to compel the assignment of those leases and the sale of the Debtor's personal property is **DENIED**.

Turning to Flour City's Sale Motion to sell substantially all of its assets under 11 U.S.C. § 363(b), the Court finds that—based on the evidence offered at trial on the Sale Motion and after extensive briefing by the parties—Flour City has failed to carry its burden to prove by a preponderance of evidence that it exercised sound business judgment in selecting the bid of Canal as the highest and best bid. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Flour City has also failed to demonstrate a basis to sell its assets free and clear of liens under either 11 U.S.C. § 363(f)(2) or (3)—those being the only grounds upon which Flour City based its motion. Flour City's motion to sell substantially all of its assets to Canal, free and clear of liens, is **DENIED**. As a result, Flour City's request that the Court approve the APA between Flour City and Canal is rendered **MOOT**. And Flour City's request to assume and assign certain executory contracts and unexpired leases to Canal is also rendered **MOOT**.


**IT IS SO ORDERED.**


DATED: September 2, 2016          _____/s/_____
       Rochester, New York          HON. PAUL R. WARREN
                       United States Bankruptcy Judge